UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------------X
CHARLES VOLPE; POLICE BENEVOLENT ASSOCIATION
OF THE POLICE DEPARTMENT OF NASSAU COUNTY,

                                  Plaintiffs,

__ Civ. __

**COMPLAINT**

               -against-

**JURY TRIAL
DEMANDED**

PATRICK RYDER, COMMISSIONER OF THE NASSAU
COUNTY POLICE DEPARTMENT, in his official and individual
capacities; RUSSELL SACKS, SERGEANT IN THE NASSAU
COUNTY POLICE DEPARTMENT, in his individual capacity;
JOSEPH MASSARO, LIEUTENANT IN THE
NASSAU COUNTY POLICE DEPARTMENT, in his individual
capacity; COUNTY OF NASSAU,

                                   Defendants.
-----------------------------------------------------------------------------X

           Plaintiffs Charles Volpe and the Police Benevolent Association of the Police Department of Nassau County, by and through their attorneys Emery Celli Brinckerhoff & Abady LLP, for their Complaint allege as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.      The County of Nassau and its Police Commissioner have spent over two years harassing and humiliating anyone who dares to challenge their authority.

       2.      This case challenges these retaliatory practices and seeks to end the reign of terror endured by Plaintiffs—Police Officer Charles Volpe and the Police Benevolent Association of the Police Department of Nassau County ("PBA")—for protesting the County's failure to honor the rights of its police officers.

       3.      Officer Volpe suffered an on-the-job injury in late 2016 that led to severe nerve damage in his dominant right hand.  He has been unable to work ever since.  When the

1

Department tried to force him back to work in early 2017, Officer Volpe not only invoked his rights under the County's collective bargaining agreement with its officers but protested his treatment and expressed that the Department had engaged in a campaign of deception and had lied to his personal doctor to try to force him back to work.

4.      Rather than honor Officer Volpe's rights under the collective bargaining agreement to undergo a neutral medical review, the Department has engaged in a years-long campaign to punish Officer Volpe for speaking out against the Department's practices.

5.      The PBA has been vocal in Officer Volpe's defense, lodging numerous complaints and protests on Officer Volpe's behalf.  But as the complaints grow louder, the County's retaliation has grown more severe—rising to the level of forcing Officer Volpe out of his house under false pretenses and forcing him to submit to a lawless drug test while investigators questioned his wife about years-old and discredited allegations.

6.      These actions have violated not only Officer Volpe's contractual rights, but his Constitutional protections under the First, Fourth, Fourteenth Amendments.  On the eve of retirement, the Defendants threaten the economic and reputational future that Officer Volpe has worked so hard to earn.

7.      This civil rights action seeks damages for this unconstitutional retaliation, these violations of Officer Volpe's right to substantive due process, and this unconstitutional drug test as violations of the First, Fourth and Fourteenth Amendments under 42 U.S.C. § 1983, and an injunction prohibiting such actions in the future.

## JURISDICTION AND VENUE

8.      This Court has original jurisdiction over Plaintiff's federal law claims under 28 U.S.C. §§ 1331, 1343.

2

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## JURY DEMAND

10.     Plaintiff demands a trial by jury in this action.

## PARTIES

11.     Plaintiff Charles Volpe is a Nassau County Police Officer.  He has been a Police Officer for nineteen years and has been on the Nassau County police force since 2004.

12.     Plaintiff PBA is the exclusive bargaining representative and union for all Nassau County police officers.  It is a not-for-profit corporation organized under the laws of the State of New York.  Its headquarters are located at 89 East Jericho Turnpike, Mineola, New York, 11501. The PBA's mission is to advance the professional interests of its members and the preserve of the health, safety, and welfare of its members while striving to provide the public with the best possible police services.

13.     Defendant Patrick Ryder is the Commissioner of the Nassau County Police Department (the "Department").  He is sued in his official and individual capacity.

14.     Defendant Russel Sacks is a Sergeant in the Medical Administration Office of the Department.  He is sued in his individual capacity.

15.     Defendant Joseph Massaro is a Lieutenant in the Medical Administration Office of the Department.  He is sued in his individual capacity.

16.     Defendant the County of Nassau (the "County") is a county in the State of New York.

## FACTS

17.     The Defendants' prolonged campaign to harass Officer Volpe and punish him and the PBA for speaking out against their mistreatment recently culminated in an unconstitutional

3

and humiliating involuntary drug test in which Officer Volpe was forced to urinate in a cup in front of an open window facing a public road while multiple supervising officers looked on and mocked him.

18.     This most recent conduct reflects the increasing severity of Defendants' conduct in their goal of undermining the PBA's authority and sending the message that anyone who speaks up for an officer's rights will be punished.

***Defendants Force Officer Volpe to Submit to a Drug Test Without Cause***

19.     On December 11, 2018 at approximately 4:40 p.m., Defendants Massaro and Sacks arrived unannounced at Officer Volpe's home.

20.     Despite the fact that these officers were purportedly investigating whether Officer Volpe was using illegal drugs, Defendants Massaro and Sacks immediately demanded that Officer Volpe get in his car, drive it, and follow them to police headquarters.  Officer Volpe was out on disability leave at that time with a hand injury, and the Defendants falsely represented that he needed to come to police headquarters for a "medical evaluation" by the Department Surgeon.

21.     The timing of this visit was suspicious and unexpected.  Officer Volpe had been given no notice of this supposed medical evaluation beforehand.

22.     Per standard protocol for Police Officers on disability leave, Officer Volpe had to remain at his home from 9:00 a.m. to 5:00 p.m. on all days he would otherwise be working.  This 4:40 p.m. demand all but assured Office Volpe would remain under the Department's supervision beyond the designated 5:00 p.m. conclusion of his mandated time of confinement.

23.     While waiting for Officer Volpe to get ready, the Officers rang the doorbell to his home over and over, deliberately disturbing Officer Volpe's wife and children.  Defendants Sacks and Massaro also screamed at Officer Volpe for not being ready to leave on a moment's

notice, deliberately causing a disturbance in his household and making his family fearful. The Officers' truculent behavior left Officer Volpe's wife visibly upset and all three of his young children crying.

24.     Despite Defendants' rude conduct towards his family and inexplicable timing for their visit, Officer Volpe complied with the Officers and got in the car to follow them to headquarters.

25.     On his way to police headquarters, Officer Volpe called Dean Losquadro, 2nd Vice President of the PBA, to inform him he was ordered to headquarters.  2nd Vice President Losquadro agreed to meet Office Volpe there.

26.     Once Office Volpe arrived, Defendants changed course, disregarding the original purported basis for dragging Officer Volpe from his home (to have his hand examined) and demanded that Officer Volpe submit to a urine test for drugs.

27.     Under the Police Commissioner's Order 8-95, entitled "Employee Drug Testing Procedures," and incorporated into the parties' Collective Bargaining Agreement ("CBA") an Officer may only be drug tested 1) based on reasonable suspicion of drug abuse; or 2) pursuant to the random testing procedures set forth in the CBA.

28.     If an officer is to be tested due to a reasonable suspicion of drug abuse, very specific procedures, not followed in this instance, documenting the basis for that suspicion must be followed.  First, the "reasonable suspicion" determination must be based on "specific articulable facts" that allow a reasonable inference of drug abuse.  These "specific facts" must be presented to the Department's Internal Affairs Unit for investigation.  The Internal Affairs Unit then must prepare a report of its findings for the officer's Division Chief.  Only then, after an

Internal Affairs investigation and a finding by a Division Chief of "specific articulable facts" supporting an inference of drug abuse, may an officer be tested "for cause."

29.       Upon learning of the true reason Officer Volpe was ordered to headquarters, 2nd Vice President Losquadro inquired whether Officer Volpe was selected randomly (an unlikely possibility given the strange timing of the test and the false pretenses used to get him to headquarters) or if he was being tested "for cause."

30.       Defendants Sacks and Massaro responded that the test was "for cause."

31.       When questioned as to what the "cause" for the test was and whether appropriate procedures had been followed, Defendants Sacks and Massaro refused to provide any basis for the test.  They did not articulate a single fact supporting the test or give any indication that the Internal Affairs Unit or a Division Chief had made the required factual findings.

32.       Nonetheless, the Defendants ordered that this unconstitutional search move forward over Officer Volpe and 2nd Vice President Losqaudro's objections.

33.       But the Defendants were not satisfied only violating Officer Volpe's constitutional rights—they then proceeded to actively humiliate him.

34.       Despite explicit provisions in the CBA banning the Department from making pre-drug test inquiries into whether an officer has been prescribed any medications, Defendant Massaro immediately asked Officer Volpe whether he had received any prescriptions—a blatant violation of Officer Volpe's contractually protected privacy.

35.       Officer Volpe was, at that time, dehydrated and was having difficulty urinating. After being informed by Officer Volpe that he needed to drink water, Defendants limited his access to water, in blatant violation of a prior arbitration order on that very subject.

36.     Defendant Massaro then falsely accused Officer Volpe of spitting into one of the cups he was attempting to urinate into.  Defendant Massaro rummaged through the garbage cans in the bathroom to retrieve already-discarded cups to investigate them for saliva.  Defendant Massaro continuously threatened that he was going to have lab testing done on the (already discarded) cups.

37.     Despite his continuing threats based on non-existent spitting (both Defendants Massaro and Sacks and 2nd Vice-President Losquadro were in the bathroom with Officer Volpe at all times) Defendant Massaro refused to articulate why the contents of a cup that was no longer being used bore any relevance to Officer Volpe's drug test.  This conduct was meant solely to harass and intimidate Officer Volpe.

38.     The Defendants' conduct only grew more brazen as Officer Volpe struggled, and the Defendants continued to call additional officers, including supervising officers, into the bathroom to watch Officer Volpe attempt to urinate.

39.     As the test dragged on, Defendant Massaro's bizarre misconduct continued.  With no explanation whatsoever, Defendant Massaro ordered Officer Volpe to face an open window, looking out onto a main county road as he attempted to urinate.

40.     While forcing Officer Volpe to publicly expose himself to an open road, Defendant Massaro made mocking comments about Officer Volpe's genitals to the other officers present.

41.     There has been and is no explanation for this conduct beyond a sadistic desire to humiliate Office Volpe.

42.     Once the test was finally complete, Officer Volpe was ordered, at 7:30 p.m. (almost three hours after he had been removed from his home), to report to the Police Surgeon to have his hand examined.

43.     Officer Volpe was then released to drive himself home.  This was the second time that evening that, despite supposedly possessing sufficient evidence of drug abuse to warrant a drug test for cause, Defendants ordered Officer Volpe to operate an automobile on the public roads.

44.     The PBA has sent three letters to Defendant Commissioner Ryder regarding this unconstitutional search and brazenly unprofessional conduct.  The PBA has received no response beyond a vague promise to investigate the matter.

45.     To this day, not a single specific fact has been articulated regarding this forced drug test and it is increasingly apparent that none of the procedures that would justify such a test were followed.

46.     The Department's post-test conduct has only reinforced the lack of any reasonable suspicion that Officer Volpe is a drug abuser.

47.     The test occurred over three months ago, yet neither Officer Volpe nor the PBA has received the results.  They have been told that the test was "positive," but the Department has refused to show Officer Volpe the results or even orally inform him what he tested positive for.

48.     This conduct is entirely inconsistent with the fiction that the Department had reason to believe one of its employees is abusing drugs and could thereby be a danger to himself and the public at large.

49.     This refusal to disclose the results of the test is even more suspicious because it is in express contravention of the CBA, which requires that any police officer who tests positive for

drugs is notified in person and has the right to: 1) have his urine retested by a private, certified laboratory, 2) have an interview regarding the positive test, and 3) be given the opportunity to submit a letter explaining the reason for the positive finding and documenting any prescriptions.

50.     While the PBA recently learned that Officer Volpe's urine sample was sent to a private lab for a second test, Officer Volpe has still not learned the results, been afforded an interview, or been given an opportunity to submit a written explanation with medical documentation.

51.     Officer Volpe has never taken illegal drugs or prescription drugs without medical authorization. Officer Volpe does, however, take a handful of medically authorized prescription drugs to treat long-standing medical conditions. To the extent there was any positive test, it was likely caused by these lawful prescriptions. Yet, with the Department refusing to disclose the results and move forward with the process, Officer Volpe is unable to provide the appropriate medical documentation that would explain any positive test.

52.     This continuing obfuscation of the results of the test is consistent with the Department's agenda of harassing Officer Volpe and retaliating against him and the PBA rather than a desire to investigate whether an employee has a drug addiction that could require disciplinary action and/or medical treatment.

53.     In fact, the Defendants' outrageous accusations have only escalated since this forced drug test, as they falsely claimed for the first time in April 2019 that Officer Volpe masturbated in the cup he was supposed to be urinating in during the test. Defendants Massaro, and Sacks and 2nd Vice President Losquadro were in the bathroom with Officer Volpe for the duration of his test and it is obvious this conduct did not occur. This accusation is meant only to continue to embarrass and harass Office Volpe.

54.      This narrative of harassment and retaliation is further reinforced by what went on while Officer Volpe was being forced to urinate in a cup facing a public window.  Twenty minutes after Officer Volpe was ordered from his home, the Department's Internal Affairs Unit called Office Volpe's wife to question her about an incident that took place over two years prior on August 6, 2016, between Officer Volpe and his ex-wife's boyfriend and for which Officer Volpe had already been cleared of wrongdoing.  This whole interaction appears to have been a ruse for the Department to harass Officer Volpe's family and to reignite controversies that were long ago put to rest.

55.      This unconstitutional conduct is only one installment in the retaliatory harassment against Officer Volpe and the PBA, designed to disgrace Officer Volpe and undermine the institutional authority of the PBA, which has been ongoing for over two years.

***Officer Volpe's Career***

56.      Office Volpe is a forty-one-year-old New Yorker who has devoted his entire professional career to protecting the citizens of his state.

57.      Officer Volpe grew up in Staten Island, New York and entered the Police Academy in the 2000 after graduating on the Dean's List from St. John's University.

58.      After three months on the traffic task force, Officer Volpe was put on patrol in the Chinatown and Little Italy neighborhoods of lower Manhattan.

59.      He remained on patrol until 2003, when he was selected to join the Commissioner's Office of Mapping and Planning.

60.      In 2004, Officer Volpe was offered a job on the County police force.  The County's pay and benefits far exceed those available to New York City police officers and, as a

result, the County police force is one of the most competitive police forces to join in the region, if not the country.

61.     Representatives from the PBA estimate approximately 5% of officers who apply for jobs with the County police force are hired.

62.     Officer Volpe left the New York City Police Department with no complaints to the Internal Affairs Bureau or Civilian Complaint Review Board to his name.  His interviewers with the County police force remarked many times that they rarely saw any applicants coming from New York City with such a pristine record.

63.     Once in the County, Officer Volpe was assigned to the Fifth Precinct, and then later to the Second Precinct, where he continued his exemplary police work from 2004-2016.

64.     Officer Volpe was recognized as the "Top Cop" of the month five times and received an additional "meritorious award" for his handling of an armed robbery of a car dealership in September 2014.

65.     Officer Volpe has never faced any disciplinary actions from the Department during his thirteen years on the force.

***Officer Volpe's Injury***

66.     On October 4, 2016, Officer Volpe fell over a ladder during his tour and severely injured his right hand.

67.     His initial diagnosis was a fractured hand.

68.     This diagnosis seemed incomplete, however, as about two weeks after the injury, Officer Volpe began to experience persistent numbness and tingling in his right hand and fingers. His right thumb also would persistently lock into place.

69.     Officer Volpe received an electromyography test in January 2017 which was negative for nerve damage.  When his condition still had not improved months later, he was retested in April 2017.  This second test and subsequent examinations revealed significant nerve damage and severe right carpal tunnel syndrome, and surgery was recommended.

70.     While it was concluded that the surgery was needed in April 2017, there were disputes with Officer Volpe's insurance carrier, and Officer Volpe was not cleared to receive the surgery until the following year.  He eventually received the necessary surgery in February 2018.

71.     Likely due to the delay in both the diagnosis and the treatment, the surgery has been only partially effective and Office Volpe to this day can barely use his (dominant) right hand.  He has undergone consistent treatment and physical therapy since the surgery, but still experiences persistent numbness in his hand, tingling in his fingers, and significant pain when he performs basic tasks using his right hand such as grabbing objects or twisting his wrist.

***The Collective Bargaining Agreement and General Municipal Law Section 207-c***

72.     When an officer is injured in the line-of-duty, the Department's Chief Surgeon makes the initial determination as to whether that officer is able to continue working and, if so, in what capacity.

73.     The CBA establishes a right of appeal for officers to appeal the Chief Surgeon's determination to the Medical Review Board (the "Board").  The Board consists of 1) the Chief Surgeon representing the Department or another physician designed by the Chief Surgeon; 2) a designated physician provided by the PBA; and, where the two designated physicians cannot agree upon a finding within sixty days, a third physician selected from a list appended to the CBA on a rotating basis.

74.     The neutral doctor, serving as the tie breaker, reviews available medical records and personally examines the patient before preparing a written recommendation to the Police Commissioner and to the PBA.  While this recommendation is only advisory, the Commissioner may only reject the recommendation if he can articulate specific reasons why the opinion is unreasonable, arbitrary and capricious, shocking to the conscious, contrary to the evidence, or obtained in a fraudulent manner.  Regardless, the Commissioner is required to notify the officer of his determination within 20 days of receiving the independent doctor's report.

75.     During the pendency of these proceedings, an officer remains out on disability leave with the understanding that, if it is determined he could have returned to work, he will retroactively lose sick days for all unworked days between the Commissioner's initial determination and the ultimate disposition of the appeal.

76.     Alternatively, an officer can invoke New York General Municipal Law Section 207-c ("207-c").  This statutory provision provides for a medical assessment of a police officer and requires that officers continue to be paid if they were injured in the line of duty and are not able to work.

***Officer Volpe is Unable to Return to Work***

77.     From the time of his injury until April 2017, it was agreed by all parties that Officer Volpe was not able to work.

78.     Around April 2017, Officer Volpe informed Defendant Sacks of the diagnosis of nerve damage in his hand and that he would require surgery.

79.     Defendant Sacks was dismissive of Officer Volpe's injury, and, shortly thereafter, Office Volpe was ordered to return to work immediately by the Department's Chief Surgeon.

80.    Pursuant to his rights under the CBA, Officer Volpe immediately invoked his right to appeal to the Medical Review Board.

81.    In May 2017, approximately one month after Officer Volpe invoked his rights, an officer with the Department's Medical Administration Office ("MAO") called Officer Volpe's treating physician to ask if Officer Volpe could return to light duty.

82.    The MAO representative claimed that light duty would not involve writing reports or interfacing with the public.  The MAO stated that officers on light duty are only required to answer the phone and are permitted to take as many breaks as needed. Based on that representation Officer Volpe's doctor stated that Officer Volpe could return to work.

83.     This representation of "light" duty, however, was false.  In fact, light duty consists of not only answering the phone, but writing reports and engaging with members of the public who come to the police station.  These in-person interactions with the public often require physical exertion, such as breaking up physical confrontations when disgruntled members of the public come to the station or effectuating arrests when persons with outstanding warrants turn themselves in.

84.    Upon learning what light duty actually consists of from Officer Volpe, Officer Volpe's doctor informed the Department that if Officer Volpe would have to write reports and engage in-person with members of the public as part of his job responsibilities, he could not return to work.

85.    Although his doctor ultimately received the correct information, Officer Volpe was concerned by the Department's attempt to manipulate his medical review by contacting his doctor directly and giving him false information.  He confronted Defendant Sacks about this and protested that his personal doctor had been lied to about what tasks he would be required to

14

perform in an attempt to undermine their contractually-agreed upon process and to force him back to work despite his injury.

86.     Defendant Sacks was enraged by Officer Volpe confronting him.  He retorted that Officer Volpe's doctor "is a fucking idiot" and angrily asserted, "no one lied," before storming away visibly upset.

87.     With no agreement between Officer Volpe's doctor and the Chief Surgeon's appointed doctor, Officer Volpe again invoked his rights to be examined by an independent third doctor.

88.     Shortly thereafter, 2nd Vice President Losquadro approached Defendant Sacks on behalf of the PBA to express his concern about the MAO calling Officer Volpe's personal doctor and to ensure Officer Volpe would receive a fair medical review.  Defendant Sacks was once again angered by the accusation that the MAO had attempted to influence Officer Volpe's doctor.  He told 2nd Vice-President Losquadro that he believes Officer Volpe is a malingerer and a faker, and that the PBA should not be defending him.

### The County Launches a Campaign of Retaliation Against Officer Volpe and the PBA

89.     Following these exchanges with Defendant Sacks, the Department launched a campaign of harassment against Officer Volpe and the PBA to retaliate against them for insisting that Officer Volpe's rights to be honored and protesting the Department's attempt to mislead his personal physician.

90.     Around April 2017, Officer Volpe first began to hear from friends and co-workers within the Department that County personnel within the MAO were openly disparaging and stigmatizing him, calling him a malingerer, and questioning the severity of his injury.

91.     At a medical appointment with the Chief Surgeon in July, Defendant Sacks continued to disparage Officer Volpe directly, accusing him of malingering and stating that he should be able to answer the phone with his right hand while typing on a computer with his left hand.

92.     In August 2017, Officer Volpe finally received what was supposed to be his independent medical exam from Dr. Jeffery Shapiro.

93.     While performing his "independent" exam, Dr. Shapiro stated that he believed Officer Volpe could answer the phone with his right hand while typing with his left hand, invoking the identical explanation used by Defendant Sacks a month earlier for how Officer Volpe could work.

94.     Dr. Shapiro issued his report *one day* after his examination of Officer Volpe, and Defendant Sacks immediately (and gleefully) called him to tell him that Dr. Shapiro had ruled against him and he must return to work.

95.     In his report, Dr. Shapiro stated that he believed Officer Volpe (whom he had just met for the first time that day) is "malingering,"—a conclusion unrelated to his medical expertise and seemingly also taken straight from Defendant Sacks.

96.     Upon information and belief, Defendant Sacks tampered with Officer Volpe's medical exam, sharing his opinions with the supposed-to-be independent doctor prior to Officer Volpe's exam, in retaliation for Officer Volpe's accusing the MAO of lying to his private physician.

97.     Despite the CBA's unambiguous terms requiring that Dr. Shapiro's report be provided to the PBA, Defendant Sacks refused to produce Dr. Shapiro's report for three weeks.

98.     Defendant Sacks also ignored that Dr. Shapiro's opinion was only advisory, insisting that Officer Volpe had "lost" and he must return to work.  This was not true, as no decision was rendered by Commissioner Ryder for another two months.

99.     Rather than wait for the Commissioner to render a ruling, the Department, emboldened by its successful tampering with Officer Volpe's medical review, immediately resumed its campaign of retaliation against Officer Volpe.

100.     First, in early August, Defendant Sacks arrived at Officer Volpe's house unannounced simply to remind him that, until he returns to work, he needs to stay at his home at all hours during the day.  He also informed Officer Volpe that he is now being labeled a "sick leave abuser," a designation meant for officers who miss multiple days of work without medical documentation and which would allow the Department to increase the amount of time Officer Volpe was forced to remain in his home.  This stated designation would not apply to an officer in Officer Volpe's situation and, in any event, would not permit the Department to confine him to his home on his days off.  This statement was meant to intentionally intimidate Officer Volpe by threatening him with further—and unwarranted—restrictions on his freedom.

101.     Second, on August 11, 2017, Officer Volpe was ordered out of his home for a medical examination by the Chief Surgeon.  This medical appointment turned out to be a ruse to harass Officer Volpe's family—once he was out of the house, the Department's Internal Affairs Unit immediately contacted Officer Volpe's wife with no prior warning and questioned her about the incident between Officer Volpe and his ex-wife's husband.

102.     Officer Volpe's wife was not present for the incident, and this call, like Defendant Sacks' visit, was calculated to send the clear message to Officer Volpe, his family, and the

PBA—that the Department would continue to punish him until they relinquished their protests regarding the Department's practices and bent to their will.

103.    Commissioner Ryder finally made his determination on October 6, 2017.  The Commissioner adopted Dr. Shapiro's opinion and ordered that Officer Volpe return to work. When meeting with Commissioner Ryder, the PBA protested the various irregularities in the process, including the MAO's clear (successful) attempt to influence the independent examiner and to force Officer Volpe back to work.  The PBA also protested the Department's failure to disclose Dr. Shapiro's report for weeks and Defendant Sacks' insistence that Officer Volpe return to work before Commissioner Ryder had made a determination.

104.    Commissioner Ryder angrily quipped "don't get technical" when questioned by the PBA about the Department's failure to follow the proper procedures through the medical review process.  He dismissed the PBA's complaints and ordered that Officer Volpe return to work irrespective of his need for surgery.

105.    On the recommendation of his doctor, Officer Volpe did not return to work, but began to use his accumulated sick days to continue to receive treatment for his hand and await his surgery.

**The Department's Retaliation Persists**

106.    Following this meeting with Commissioner Ryder, the Department escalated its retaliation against the PBA for protesting its failure to honor Officer Volpe's rights under the CBA.

107.    The Department developed a clear strategy of retaliation.  The Department began to deny Officer Volpe his basic rights both under the CBA and as a Nassau County public

employee.  Only after pushing him to exhaust all processes available to him, would they relent and acknowledge his rights.

108.    First, the Department baselessly denied Officer Volpe indemnification for a lawsuit where he was a named Defendant.

109.    In November 2013, Officer Volpe had been part of an arrest that resulted in a subsequent civil rights lawsuit against Officer Volpe and his partner, Officer Victor Gladitz.

110.    Officer Gladitz had a more direct connection to the alleged misconduct than Officer Volpe.  In fact, Officer Volpe had told his patrol supervisor on the scene of the arrest that he did not think the would-be-plaintiff should be arrested.

111.    Nonetheless, in December 2017, the Department announced, without explanation, that Officer Gladitz would be indemnified in the civil rights lawsuit resulting from the arrest, but that Officer Volpe would not.

112.    Officer Volpe was forced to appeal this decision and did not have indemnification reinstated until after an additional hearing in June 2018.  Officer Gladitz was indemnified during this entire period.  During the period when Officer Volpe's indemnification was withheld, he and his family believed they could be exposed to potentially significant damages and the PBA could be exposed to significant legal expenses on Officer Volpe's behalf.

113.    The Department did not, and never has, offered an explanation as to why the two officers were treated differently.  This baseless denial of Officer Volpe's rights was intimidation, retaliation, and punishment of Officer Volpe and the PBA.

114.    This treatment continued in February 2018 when Officer Volpe finally received the required surgery on his hand.  Following his surgery, Officer Volpe requested that his medical review be reinstated.

115.    Chief Surgeon Asheld of the MAO told Officer Volpe that his injury likely would qualify as a disability that would prevent him from working, but the "political winds might blow" in a different direction.

116.    Consistent with Chief Surgeon Asheld's warning, the Department then refused to reopen Officer Volpe's medical review and told him that he would have to go through a 207-c hearing if he wanted to be paid while out of work recovering.

117.    Officer Volpe's 207-c hearing was scheduled for June 12, 2018, the last possible day before Officer Volpe ran out of his earned sick leave that he had been using to continue to recover from his injury.

118.    Officer Volpe's personal doctor, Dr. Kupersmith, agreed to testify at his hearing. Two weeks before the hearing, Officer Volpe informed the Department that Dr. Kupersmith would testify by phone to accommodate his schedule.

119.    *The day of the hearing*, the Department for the first time protested and insisted that Dr. Kupersmith appear in person.

120.    This delayed opposition was calculated to make it difficult for Dr. Kupersmith (who was understandably annoyed) to testify and to interfere with Officer Volpe's relationship with his own doctor who was supporting him in this process of assessing his injury.

121.    The Department, also for the first time on the day of the hearing, protested having a PBA representative present at the hearing.  This protest was clearly designed to intimidate the PBA in its attempts to protect Officer Volpe's rights to a fair medical review.  PBA representatives regularly attend all hearings for members.

122.    After one day of testimony, the Department changed course, suspending the hearing and granting Officer Volpe the medical review pursuant to the CBA he had requested

20

and been entitled to in February.  The Department agreed that Officer Volpe would go back on disability leave until he received a medical review.

123.    As with Officer Volpe's denied indemnification, this forced 207-c hearing reflects the Department's strategy of baselessly ignoring Officer Volpe's rights until the last possible opportunity to honor them—often after months of hardship to Officer Volpe and the PBA.

124.    The PBA once again protested to Commissioner Ryder.  On both April 26, 2018 and July 31, 2018, PBA President James McDermott met with Commissioner Ryder to protest the Department's tampering with the medical review process, including Defendants Massaro's and Sacks' interference with Dr. Shapiro's assessment of Officer Volpe, and the Department's prolonged failure to provide Officer Volpe with an additional medical review.

125.    This continued petitioning of the Department led only to increased retaliation.

126.    On July 12, 2018 and November 21, 2018, Defendants Sacks and Massaro arrived unannounced at Officer Volpe's home on his days off to tell him he needed to be in his house if he was not working.  While true that Officer Volpe was required to remain at home *on days he would otherwise be working* while on disability leave, there is no such requirement on his days off.  Officer Volpe told Defendants Sacks and Massaro that, while he happened to be at his home when they arrived, there is no requirement that he be at home on his days off.

127.    Defendants Sacks and Massaro were undeterred, insisting that Officer Volpe must be home 24 hours a day, seven days a week at penalty of losing his job.  These actions were clearly designed to intimidate Officer Volpe to relinquish his protests of his treatment and return to work.

128.     On at least one occasion, Defendant Sacks was seen by Officer Volpe opening Officer Volpe's family's mailbox, removing and reading his mail in violation of federal law, and writing down notes.

129.     This retaliatory conduct continued to escalate on December 11, 2018, when Defendants Sacks and Massaro arrived at Officer Volpe's house and forced him to submit to the unlawful and humiliating drug test (the "Drug Test") as set forth at Paragraphs 12-45 above.

***The PBA and Officer Volpe Protest the Department's Unlawful Drug Test***

130.     Both the PBA and Officer Volpe protested the Department's unlawful Drug Test.

131.     On December 13, 2018, 2 days after the Drug Test, 2nd Vice-President Losquadro sent a letter to Commissioner Ryder detailing what had occurred, detailing the ways in which the Drug Test violated the proper procedure under the CBA, and noting the disturbing pattern of retaliatory behavior by the Department as a whole and by Defendants Sacks and Massaro in particular, as well as questioning why Internal Affairs contacted Officer Volpe's wife about a two-year-old incident while this abuse of Officer Volpe was ongoing.

132.     When the PBA received nothing more than a form response, 2nd Vice-President Losquadro wrote to Commissioner Ryder again on December 17, 2018 to reaffirm the numerous violations of Officer Volpe's rights and the CBA that occurred and reiterate the PBA's request for an explanation.

133.     On December 14, 2018, Office Volpe's wife wrote to Commissioner Ryder describing the abuse she witnessed when her husband was removed from the family home to undergo this unlawful Drug Test and the phone call she received from Internal Affairs in the interim.

22

134.    Officer Volpe himself filed a formal complaint with the Nassau County Equal Employment Opportunity Commission on December 28, 2018 detailing the unlawful drug test and physical and verbal abuse he endured at the hands of the Department.

135.    With no response from the Department, PBA President McDermott once again met with Commissioner Ryder on January 2, 2019 and January 4, 2019 to assert Officer Volpe's and the PBA's rights and to protest the Department's actions.

***The Department Once Again Retaliates Against Officer Volpe and the PBA***

136.    Enraged by the PBA and Officer Volpe's continued protesting of the Department's practices, the Department embarked on yet another series of retaliatory actions.

137.    At the January 2nd and 4th meetings, Commissioner Ryder once again lashed out at the PBA's attempts to petition the Department.  Commissioner Ryder baselessly ranted that he believes Officer Volpe is a drug abuser, and probably a drug dealer.  He went on that he believes Officer Volpe tried to burn down his own house (there had been a fire at his house years prior) and that he had beaten his ex-wife (a nine-year-old accusation which his ex-wife immediately withdrew and recanted).

138.    When questioned about the Drug Test, Commissioner Ryder stated that he and Internal Affairs questioned Officer Volpe's wife alone because Officer Volpe was always home. Commissioner Ryder explained that he told Internal Affairs to question her while Officer Volpe was being drug tested.

139.    The obvious implication of this statement is that Commissioner Ryder either directly ordered the Drug Test or, at the very least knew of the unlawful Drug Test and allowed it to go forward as a pretext to harass Officer Volpe and his family.

140.    At that meeting, Commissioner Ryder added that he believes Officer Volpe is a faker and a malingerer.

141.    At the January 4, 2019 meeting, Commissioner Ryder went further, stating he had Officer Volpe drug tested because he receives prescriptions from a doctor on Staten Island (Officer Volpe is from Staten Island) and because he did not use his workers' compensation number when filling his prescriptions (they are for a lifelong conditions—not a workplace injury covered by workers compensation).

142.    These explanations are as pretextual as they are ridiculous.  The Department did not comply with department policy or any of the CBA rules governing drug tests for cause.

143.    As PBA President McDermott also pointed out to Commissioner Ryder, Defendants Sacks and Massaro allowed Officer Volpe to drive to and from the Drug Test, a dangerous and irresponsible action if they actually believed he was abusing prescription drugs.

144.    Commissioner Ryder had no explanation for why "for cause" testing procedures were not followed or why Officer Volpe was permitted to drive if the Department truly believed he was abusing drugs.

145.    Instead, Commissioner Ryder continued his unfounded assaults on Officer Volpe's character, claiming that he is obviously faking his injury because he is a "video game champion."

146.    This claim by Commissioner Ryder is particularly revealing because it appears that the Department, in an effort to discredit Officer Volpe and the PBA's complaints, began to monitor Officer Volpe over the internet.

147.     Officer Volpe has young children who frequently play video games on the internet.  In an effort to protect their identity on the internet, Officer Volpe registered his children's accounts in his name.

148.     Upon information and belief, the Department learned of these video game accounts, used by Officer Volpe's children, and unlawfully conducted surveillance in order to further retaliate against Officer Volpe and the PBA.

149.     In addition, the Department returned to its modus operandi of threatening not to indemnify Officer Volpe as a means to retaliate.

150.     On January 5, 2019, Officer Volpe received a letter from Commissioner Ryder, dated December 28, 2018, stating that if he did not contact the County Legal Department regarding a deposition in a pending case by January 4, 2019 (the day before he received the letter), his indemnification would be revoked.

151.      Commissioner Ryder's letter also stated that Officer Volpe had failed to appear at a Court-ordered deposition.  This was a lie.  Officer Volpe first learned of his deposition on December 28, 2018, and immediately contacted the County Attorney.  The deposition was scheduled for January 14, 2019.

152.     Nonetheless, Commissioner Ryder insisted that, as of January 5th, Officer Volpe's indemnification would need to be revoked because he had not appeared for a deposition scheduled to occur nine days later.

***The PBA Continued to Protest; the Department Continued to Retaliate***

153.     At the January 4th meeting with Commissioner Ryder, PBA President McDermott made clear that if the Department did not stop retaliating against Officer Volpe, the PBA and Officer Volpe would file a lawsuit.

154.    On January 25, 2019, the PBA continued to petition the Department, submitting a formal grievance under the Collective Bargaining Agreement regarding the Department's failure to follow Department policy or the requirements of the CBA before administering a drug test.

155.    While this grievance was ongoing, Officer Volpe received his second medical review, this time from Doctor Enrico S. Mango.

156.    In Dr. Mango's thorough 11-page report, he assessed the history of Officer Volpe's injury, reviewed medical records, and performed a physical examination.  Dr. Mango "determined, to a reasonable degree of medical certainty" that Officer Volpe's injury is "directly and causally related to the work accident of October 4, 2016" and it was his medical opinion that "Officer Volpe is 100% disabled with respect to the injuries sustained . . . [and] at this time Police Officer Volpe is not able to return to work as a Police Officer for Nassau County either in a full or restricted duty capacity."

157.    This determination covered the entire period from when Officer Volpe was first injured, providing further evidence that the Department had improperly influenced Dr. Shapiro's 1-page assessment that Officer Volpe was "malingering" two years prior.

158.     But where Officer Volpe and the PBA saw vindication, the Department saw another opportunity for retaliation.

159.    Four days later, on March 19, 2019, PBA President McDermott, 2nd Vice-President Losquadro, Sergeant at Arms John Carroll, and 2nd Precinct Trustee Ken Cortes went to meet with Commissioner Ryder and other high-ranking members of the Department.

160.    At this meeting, the Department revealed that they had *installed a security camera* across the street from Officer Volpe's home and had been videotaping him with surveillance cameras since the summer of 2018, twenty-four hours a day, seven days a week.

26

161.    The Commissioner played a tape for about fifteen minutes. The tape showed Officer Volpe talking on his cell phone using his injured right hand, carrying a small plastic bag with his right hand and, on one occasion, moving a car seat using his injured hand.  None of this footage contradicted Officer Volpe's claims that he cannot work as a Police Officer due to his injuries.

162.    The PBA representatives expressed their confusion both as to why Officer Volpe was under surveillance and what the video was supposed to prove, as Officer Volpe was not shown using his hand in a manner inconsistent with his injury.  The Department did not respond and immediately turned the tape off.

163.    The PBA representatives also questioned why taxpayer funds were being used to satisfy the Department's personal vendetta by spending County resources to obtain thousands of hours of video surveillance of Officer Volpe at his home.

164.    Following their now well-established pattern, the Department immediately resorted to threats and punishment for standing up to their authority.  Commissioner Ryder proceeded to threaten that he was going to issue 110 violations against Officer Volpe for being outside of his house between 9:00 a.m. and 5:00 p.m. and would refer Officer Volpe to the Nassau County District Attorney for (non-existent) insurance fraud if the PBA and Officer Volpe did not abandon their complaints.

165.    The Department then continued their retaliation, personally delivering their surveillance video to Dr. Mango and hovering over him as he watched it in a desperate attempt to convince him to reassess his medical findings.  This action violated the CBA in multiple ways, as the Department 1) did not submit any footage to Dr. Mango at the time of his review despite acknowledging that Officer Volpe was under video surveillance since the summer of 2018; only

new evidence is permitted to be introduced after the fact; and 2) did not disclose the full video as would be required for the footage to be shared with Dr. Mango.

166.    Undeterred by its own agreement, the Department has continued to retaliate against Officer Volpe and the PBA for speaking out about their rights as County and Department employees.

### FIRST CLAIM FOR RELIEF
(Substantive Due Process : 42 U.S.C. § 1983)
(Plaintiff Volpe Only)

167.    Plaintiff Volpe restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

168.    Defendants at all times acted under color of New York State law.

169.    As evidenced by Defendants' continued campaign of harassment of Officer Volpe and his family for two years, including harassing Officer Volpe and his family at his home and on his days off, baselessly denying him indemnification, depriving him of his sick leave despite a determination that he is disabled, interfering with his relationship with his personal doctor, forcing him to submit to an unlawful and involuntary drug test, engaging in months of constant surveillance of Officer Volpe both at his home and on the internet, and making numerous defamatory statements about Officer Volpe, Defendants' actions shocked the conscience and violated Officer Volpe's right to privacy, personal autonomy and freedom from arbitrary governmental harassment.

170.    Defendant County of Nassau had a policy or practice of harassing Officer Volpe and infringing on his right to privacy and personal autonomy.  Defendant Ryder is a policy-making official for the County of Nassau and either made all decisions to take the actions which

infringed on Officer Volpe's rights or was aware of this ongoing infringement and allowed it to
persist.

171.     Defendants' conduct was willful, intentional, and in reckless disregard of
Plaintiff's civil rights.

172.     By virtue of the foregoing, Defendants are liable for having substantially caused
the foregoing violations of Plaintiff's Constitutional rights and, as a direct and proximate result
of Defendants' unlawful conduct, Plaintiff Volpe has sustained damages.

**SECOND CLAIM FOR RELIEF**
(First Amendment Retaliation: 42 U.S.C. § 1983)
(All Plaintiffs)

173.     Plaintiffs restate and incorporate by reference the preceding paragraphs above as
if fully set forth herein.

174.     Defendants at all times acted under color of New York State law.

175.     From approximately April 2017 through March 2019, Defendants have subjected
Officer Volpe to a lawless drug test, tampered with Officer Volpe's right to a fair medical review
under the CBA, harassed Officer Volpe and his family at his home and on his days off,
baselessly denied him indemnification, deprived of his sick leave despite a determination that he
is disabled by an independent medical examiner, interfered with his relationship with his
personal doctor, engaged in constant surveillance of Officer Volpe both at his home and on the
internet, and made defamatory accusations regarding Officer Volpe's character.

176.     As evidenced by the timing of these incidents following Officer Volpe's accusing
the Department of lying to his personal doctor to force him to return to work and escalating
every time his treatment was challenged or protested, including, but not limited to his filing a
formal complaint after he was unlawfully drug tested, Defendants caused Officer Volpe to

endure this harassing and humiliating treatment for the purpose of punishing him for the exercise of his First Amendment rights to petition.

177.    As evidenced by the timing of these incidents following the PBA's numerous complaints to Defendants regarding their attempts to tamper with Officer Volpe's medical review procedure and their disregard for Officer Volpe's civil and contractual rights, including, but not limited to, in-person complaints to Defendant Sacks in or around April 2016, in-person complaints to Commissioner Ryder on October 6, 2017, April 26, 2018, July 31, 2018,  January 2, 2019, January 4, 2019, and March 19, 2019, and sending two letters and filing a formal grievance in response to Officer Volpe's unlawful drug test,  Defendants sought to punish the PBA and undermine its authority and its relationship to its members for the exercise of their First Amendment rights to Petition.

178.    Defendant County of Nassau had a policy or practice of engaging in this retaliatory behavior when individual officers and the PBA petitioned the Department for failing to honor officers' civil and contractual rights.  Defendant Ryder is a policy-making official for the County of Nassau and either made all decision to retaliate against Officer Volpe and the PBA or was aware of this ongoing retaliation and allowed it to persist.

179.    Defendants' conduct was willful, intentional, and in reckless disregard of Plaintiffs' civil rights.

180.    By virtue of the foregoing, Defendants are liable for having substantially caused the foregoing violations of Plaintiffs' Constitutional rights and, as a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have sustained damages.

## THIRD CLAIM FOR RELIEF
(Fourth Amendment Unlawful Search and Seizure: 42 U.S.C. § 1983)
(Plaintiff Volpe Only)

181.    Plaintiff Volpe restates and incorporates by reference the preceding paragraphs above as if fully set forth herein.

182.    Defendants at all times acted under color of New York State law.

183.    On December 11, 2018, Defendants unlawfully seized Officer Volpe under false pretenses and forced him to submit to a drug test in violation of the Fourth Amendment to the United States Constitution.

184.    Officer Volpe did not consent to this search.

185.    The search was unaccompanied by any warrant, probable cause, or reasonable suspicion.

186.    The search was beyond of the scope of the Fourth Amendment protections relinquished by virtue of Department policy and the CBA.

187.    Defendant County of Nassau had a policy or practice of conducting these unlawful searches and seizures.  Defendant Ryder is a policy-making official for the County of Nassau and made the decision to force Officer Volpe to submit to an unconstitutional drug test.

188.    Defendants' conduct was willful, intentional, and in reckless disregard of Plaintiff's civil rights.

189.    By virtue of the foregoing, Defendants are liable for having substantially caused the foregoing violations of Plaintiff's Constitutional rights and, as a direct and proximate result of Defendants' unlawful conduct, Plaintiff Volpe has sustained damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request judgment against

Defendants as follows:

    a.  An injunction requiring the Department to refrain from taking further

        retaliatory or harassing actions against Officer Volpe including terminating

        his employment on the basis of false accusations; to refrain from taking

        further retaliatory action against the PBA; to allow Officer Volpe to obtain a

        neutral medical review as proscribed in the CBA; and to

        refrain from all future drug tests of PBA members without complying with the

        provisions of the CBA;

    b.  Compensatory damages in an amount to be determined;

    c.  Punitive damages;

    d.  Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

    e.  Such other and further relief as this Court may deem just and proper.

Dated:   New York, New York
          April 16, 2019

                                 EMERY CELLI BRINCKERHOFF &
                                 ABADY LLP

                               By:          /s/

                                 Richard D. Emery
                                 David Berman
                                 600 Fifth Avenue
                                 New York, New York 10020
                                 (212) 763-5000