**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
CHARLES VOLPE and POLICE BENEVOLENT
ASSOCIATION OF THE POLICE DEPARTMENT
OF NASSAU COUNTY,

                                Plaintiffs,

                  -against-

PATRICK RYDER, Commissioner of the Nassau County
Police Department, in his official and individual capacities,
RUSSELL SACKS, Sergeant in the Nassau County Police
Department, in his individual capacity, JOSEPH MASSARO,
Lieutenant in the Nassau County Police Department, in his
individual capacity and COUNTY OF NASSAU,

                                Defendants.
-----------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV 19-2236 (JMA) (ARL)

**LINDSAY, Magistrate Judge:**

On April 16, 2019, the plaintiffs, Charles Volpe ("Volpe") and the Police Benevolent

Association of the Police Department of Nassau County (the "PBA"), commenced this action

against the defendants, Patrick Ryder ("Ryder"), Russel Sacks ("Sacks"), Joseph Massaro

("Massaro") and the County of Nassau (the "County") (collectively, the "defendants"), pursuant

to 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments to the United States

Constitution, challenging the alleged retaliatory practices of the defendants.  Before the Court, on

referral from District Judge Azrack, is the defendants' partial motion to dismiss the complaint

pursuant to Fed. R. Civ. P. 12(b)(6).  For the reasons set forth below, the undersigned

respectfully recommends that the motion be granted.

## BACKGROUND

### A.    Factual Averments

The following facts are drawn from the Complaint and are accepted as true for purposes

of the instant motion.  *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993).  These

facts, however, do not constitute findings of fact by the Court.  *See Colvin v. State University*

*College at Farmingdale*, No. 13-CV-3595 (SJF) (ARL), 2014 U.S. Dist. LEXIS 85678, 2014

WL 2864224, at *1, n.1 (E.D.N.Y. June 19, 2014).

###### 1.      The Parties

Volpe is an experienced police officer, who has worked for the Nassau County Police

Department ("NCPD") since 2004.  Compl. ¶ 11.  The PBA is the exclusive bargaining

representative and union for all County police officers.  *Id.* ¶ 12.  The defendant County is a

municipal corporation of the State of New York with direct authority over the NCPD.  *Id.* ¶ 16.

The defendant Ryder is the Commissioner of the NCPD.  *Id.* ¶ 13.  The defendant Sacks is a

Sergeant in the Medical Administration Office (the "MAO") of the NCPD.  *Id.* ¶ 14.  The

defendant Massaro is a Lieutenant in the MAO.  *Id.* ¶ 15.

###### 2.      Volpe's Background and Service

Volpe, who was forty-one when he commenced this action, grew up in Staten Island,

New York and entered the Police Academy in 2000 after graduating from St. John's University.

*Id.* ¶ 57.  After three months on the traffic task force, Volpe was assigned to patrol in Chinatown

and Little Italy.  *Id.* ¶ 58.  He remained on patrol until 2003, when he was selected to join the

Commissioner's Office of Mapping and Planning.  *Id.* ¶ 59.

As noted above, in 2004, Volpe was offered a job with the NCPD.  *Id.* ¶ 60.

Volpe left the New York City Police Department having received no complaints from the

Internal Affairs Bureau or Civilian Complaint Review Board.  *Id.* ¶ 62.  Volpe was first assigned

to the Fifth Precinct, and later to the Second Precinct, where he worked until 2016.  *Id.* ¶ 63.

Volpe received the Precinct's "Top Cop of the Month" five times and a "meritorious award" for

his handling of an armed robbery of a car dealership in September 2014.  *Id.* ¶ 64.  During his thirteen years on the force, Volpe never faced disciplinary actions.  *Id.* ¶ 65.

### 3.      Volpe's Injury

On October 4, 2016, Volpe fell over a ladder during his tour and fractured his right hand.  *Id.* ¶¶ 66-7.  Two weeks after the injury, Volpe began to experience persistent numbness and tingling in his right hand and fingers.  *Id.* ¶ 68.  In addition, his right thumb would lock into place.  *Id.*  In January 2017, Volpe had an electromyography test that was negative for nerve damage.  *Id.* ¶ 69.  In April 2017, he was retested and the second test revealed nerve damage and right carpal tunnel syndrome.  *Id.*  Volpe's physician recommended surgery but Volpe was not cleared by his insurance company until February 2018.  *Id.* ¶ 70.  Volpe ultimately had the surgery but contends that it was only partially effective.  *Id.* ¶ 71.

### 4.      Rules Governing Line-of-duty Injuries

According to the complaint, when a police officer is injured in the line-of-duty, the NCPD's Chief Surgeon makes the initial determination as to whether that officer is able to continue working and, if so, in what capacity.  *Id.* ¶ 72.  Pursuant to the Collective Bargaining Agreement (the "CBA"), police officers can then appeal the Chief Surgeon's determination to the Medical Review Board, which consists of the Chief Surgeon or another physician designated by the Chief Surgeon and a physician designated by the PBA.  *Id.* ¶ 73.  If the two designated physicians cannot agree upon a finding within sixty days, a third physician is selected from a list of doctors appended to the CBA on a rotating basis.  *Id.*  The neutral doctor, serving as the tie breaker, reviews available medical records and personally examines the officer before preparing a written recommendation to the Police Commissioner and to the PBA.  *Id.* ¶ 74.  The neutral physician's recommendation is advisory, but the Commissioner may only reject the

recommendation if he or she can articulate specific reasons why the opinion is unreasonable, arbitrary and capricious.  *Id.*   The Commissioner is required to notify the officer of his or her determination within 20 days of receiving the independent doctor's report.  *Id.*  Officers who remain out on disability leave during the appeals process do so with the understanding that, if it is later determined they could have returned to work, the officers will retroactively lose sick days for all the unworked days between the initial determination and the ultimate disposition of the appeal.  *Id.* ¶ 75.

**5.      The NCPD's Attempts to Force Volpe to Return to Work**

In April 2017, the NCPD's Chief Surgeon ordered Volpe to return to work.  *Id.* ¶¶ 3, 78-9.  Volpe immediately sought an appeal.  *Id.* ¶¶ 3-4, 80.  Shortly thereafter, a MAO officer called Volpe's treating physician to ask if Volpe could engage in light duty.  *Id.* ¶ 81.  The MAO officer claimed that light duty would not involve writing reports or interfacing with the public.  *Id.* ¶ 82.  In fact, he stated that officers on light duty are only required to answer the phone.  *Id.*  Volpe says that based on the MAO officer's representation, his doctor indicated that Volpe could return to work.  *Id.*  However, Volpe asserts that the MAO officer's representation was false.  *Id.* ¶ 83.  He says that light duty consists of not only answering the phone but writing reports and engaging with members of the public who come to the police station.  *Id.*  Volpe further contends that these in-person interactions with the public often require physical exertion, such as breaking up physical confrontations when disgruntled members of the public come to the station or effectuating arrests when persons with outstanding warrants turn themselves in.  *Id.*  Accordingly, Volpe's doctor reversed his position when he learned more about what light duty entailed.  *Id.* ¶ 84.

After learning that a MAO representative had contacted his doctor directly, Volpe

confronted Sacks who appears to have made the phone call. *Id.* ¶ 85. Volpe accused him of trying to manipulate his medical review by giving his doctor false information. *Id.* Sacks was enraged and stated that Volpe's doctor "[was]is a fucking idiot." *Id.* ¶ 86. Moreover, Sacks disputed that anyone had lied to Volpe's physician. *Id.* Nevertheless, following the incident, Volpe asked to be examined by an independent third doctor. *Id.* ¶ 87.

Dean Losquadro, 2nd Vice President of the PBA ("Losquadro"), also approached Sacks and expressed concern that the MAO had contacted Volpe's personal doctor directly. *Id.* ¶ 88. Sacks was similarly angered that Losquadro was accusing the MAO of attempting to influence Volpe's doctor. *Id.* In fact, he told Losquadro that Volpe was a malingerer and a faker and argued that the PBA should not be defending him. *Id.*

### 6. Incidents Surrounding the Independent Medical Review and the Commissioner's Ultimate Determination

Soon after he confronted Sacks, Volpe learned from friends and co-workers that personnel within the MAO were openly disparaging him, specifically calling him a malingerer and questioning the severity of his injury. *Id.* ¶ 90. Indeed, in July 2017, Sacks directly disparaged Volpe at one of his medical appointments, accusing him of malingering and stating that he should be able to answer the phone with his right hand while typing on a computer with his left. *Id.* ¶ 91. Then, in early August 2017, Volpe received an independent medical exam from Dr. Jeffery Shapiro ("Shapiro"). *Id.* ¶ 92. During the exam, Shapiro stated that he also believed Volpe could answer the phone with his right hand and type with his left hand. *Id.* ¶ 93. The following day, Shapiro reported that Volpe could return to work.[1] *Id.* ¶ 94. In addition, Shapiro specifically stated in the report that Volpe was "malingering." *Id.* ¶ 95. Volpe asserts that his independent medical review was tainted by the fact that Sacks shared is own views with

---

[1] Volpe complains that Sacks refused to provide the PBA with Shapiro's report for three weeks. *Id.* ¶ 97

Shapiro prior to the exam. *Id.* ¶ 96.  Volpe alleges that Sacks did so to get back at him for accusing Sacks of misleading his private physician. *Id.*

In any case, upon receipt of Shapiro's report, Sacks insisted that Volpe return to work despite the fact that Commissioner Ryder had not yet rendered his final decision on the appeal. *Id.* ¶ 98.  Volpe refused.  So, in early August, Sacks drove to Volpe's house to remind him that until he returned to work, he needed to stay at his home at all hours during the day. *Id.* ¶ 100. He also told Volpe that he was being "labeled a sick leave abuser," which Volpe claims is a designation meant for officers who miss multiple days of work without medical documentation. *Id.*  The designation allows the NCPD to increase the amount of time an officer is forced to remain at home. *Id.*  Volpe contends that labeling him with the sick leave abuser designation was meant to further intimidate him and restrict his freedom on his days off. *Id.*

On August 11, 2017, Volpe was then ordered out of his home for a medical examination by the Chief Surgeon. *Id.* ¶ 101.  As soon as he was out of the house, a representative from the Internal Affairs Unit attempted to contact Volpe's wife and question her about an incident between Volpe and his ex-wife's husband. *Id.*  Volpe's wife was not home to accept the call but Volpe asserts that the call was intended to send his family and the PBA a message that the NCPD would continue to punish him if he continued to fight the determination requiring him to return to work. *Id.* ¶ 102.

On October 6, 2017, Commissioner Ryder issued his final determination and ordered Volpe to return to work. Id. ¶ 103.  The PBA protested, citing several irregularities in the medical review process. *Id.*  Ryder responded, "don't get technical" and restated that Volpe was to return to work. *Id.* ¶ 104.  Despite Ryder's determination, "on the recommendation of his doctor," Volpe refused. *Id.* ¶ 105.  Instead, he began to use his accumulated sick days so that he

could continue to receive treatment for his hand and await his surgery. *Id.*

### 7. Acts of Retaliation

Volpe complains that the NCPD continued to retaliate against for refusing to return to work. First, Volpe claims that the NCPD refused to indemnify him for a lawsuit in which he was named as a defendant stemming from a 2013 incident. *Id.* ¶¶ 108-10. To this end, in December 2017, the NCPD announced that a colleague, who also involved in the incident, would be indemnified but Volpe would not. *Id.* ¶ 111. Volpe was forced to appeal the decision and did not have indemnification reinstated until after an additional hearing in June 2018. *Id.* ¶ 112.

In February 2018, following his hand surgery, Volpe also requested that his medical review be reinstated. *Id.* ¶ 114. According to Volpe, Chief Surgeon Asheld ("Asheld") of the MAO told him that, although his injury would likely qualify as a complete disability, the "political winds might blow in a different direction." *Id.* ¶ 115. As Asheld had predicted, the NCPD refused to reopen Volpe's medical review and told him that he would have to seek a 207-c hearing if he wanted to be paid while he was out of work. *Id.* ¶ 116.

Two weeks before the 207-c hearing was scheduled, Volpe informed the NCPD that his personal doctor would be testifying on his behalf by telephone. *Id.* ¶¶ 117-18. However, on the day of the hearing, the NCPD insisted that his doctor appear in person. *Id.* ¶ 119. The NCPD also argued that a PBA representative could not be present during the hearing. *Id.* ¶ 121. Volpe claims that these protests were designed to intimidate the PBA and further discourage its attempts to protect Volpe's rights. *Id.* Nonetheless, the hearing went forward. But, at the close of the first day of testimony, the NCPD suspended the hearing and granted Volpe a new medical review. *Id.* ¶ 122. In addition, the NCPD permitted Volpe to go back on disability leave. *Id.* Volpe argues that the defendants' insistence that he participate in the sham 207-c hearing for a

single day before agreeing to the new medical review is a further reflection of the NCPD's attempt to ignore his rights until the last possible second. *Id.* ¶ 123.

In any case, following the discontinued hearing, the PBA President, James McDermott, met with Ryder to complain, once again, that the NCPD was interfering with Volpe's medical review process. *Id.* ¶ 124. Volpe alleges that McDermott's complaints led to further retaliation. *Id.* ¶ 125. For example, on July 12, 2018, Sacks and Massaro arrived unannounced at Volpe's home, on his day off, to tell him he needed to be in his house if he was not working. *Id.* ¶ 126. Volpe disputed that there was any such requirement. *Id.* Undeterred, Sacks and Massaro insisted that he be home 24 hours a day, seven days a week or risk losing his job. *Id.* ¶ 127. In addition, on at least one occasion, Volpe saw Sacks opening his mailbox and removing and reading his mail. *Id.* ¶ 128.

Then, on December 11, 2018, in what Volpe says was a direct response to the complaints lodged by the PBA on his behalf, Volpe was forced out of his house and required to submit to a drug test. *Id.* ¶¶ 5, 17. Specifically, at approximately 4:40 p.m., Massaro and Sacks arrived at Volpe's home unannounced. *Id.* ¶ 19. They claimed to be investigating whether Volpe was using illegal drugs. *Id.* ¶ 20. Massaro and Sacks demanded that Volpe follow them to police headquarters for a medical evaluation by the NCPD Surgeon. *Id.* Volpe contends that the timing of this visit was suspicious and unexpected. *Id.* ¶ 21. Volpe had been given no notice that a medical evaluation was required beforehand. *Id.* Volpe also complains that while Massaro and Sacks were waiting for Volpe to get ready, they rang the doorbell to his home over and over, deliberately disturbing his wife and children. *Id.* ¶ 23. They also screamed at Volpe for not being ready to leave on a moment's notice, which upset his wife and children. *Id.*

Ultimately, Volpe followed Massaro and Sacks to headquarters. *Id.* ¶ 24. On his way,

Volpe telephoned Losquadro to inform him that he was ordered to headquarters. *Id.* ¶ 25. Losquadro agreed to meet Volpe there. *Id.* Once Volpe arrived, the defendants demanded that he submit to a urine test for drugs. *Id.* ¶ 26. When Losquadro arrived at headquarters, Losquadro asked the defendants whether Volpe was being tested "for cause" or had been selected randomly for a drug test.[2] *Id.* ¶ 29. Massaro and Sacks responded that the test was "for cause." *Id.* ¶ 30. However, neither officer articulated a single fact supporting the test for cause nor did they suggest that the Internal Affairs Unit or a Division Chief had made the required factual findings. *Id.* ¶ 31. Accordingly, Volpe and Losquadro continued to object, but ultimately Volpe agreed to submit to the test. *Id.* ¶ 32.

The defendants then asked Volpe whether he had been prescribed any medications, which Volpe argues is in violation of CBA provisions. *Id.* ¶ 34. The defendants also denied Volpe's request for water before he urinated. *Id.* Massaro even accused Volpe of spitting into one of the cups into which he was attempting to urinate. *Id.* ¶¶ 34-5. In fact, Massaro rummaged through the garbage cans in the bathroom to retrieve already-discarded cups to investigate them for saliva. *Id.* ¶ 36. Volpe's contends that the cup bore no relevance to the drug test and Massaro's actions were simply a tactic to intimidate him. *Id.* ¶ 37.

Volpe further asserts that the defendants' conduct grew more brazen when he struggled to urinate. *Id.* ¶ 38. Specifically, the defendants called additional police officers, including supervising officers, into the bathroom to watch Volpe attempt to urinate. *Id.* Then, without explanation, Massaro ordered Volpe to face an open window looking out onto a main road as he attempted to urinate. *Id.* ¶ 39. While he did so, Massaro made mocking comments about Volpe's genitals to the other officers present. *Id.* ¶ 40. Several hours later, when the drug test

---

[2] According to Volpe, a police officer may only be drug tested based on reasonable suspicion of drug abuse or pursuant to the random testing procedures set forth in the CBA. *Id.* ¶ 27.

9

was complete, Volpe was ordered to report to the Police Surgeon to have his hand examined.  *Id.* ¶ 42.  Volpe was then allowed to drive himself home.  *Id.* ¶ 43.

Two days later, Losquadro sent a Ryder a letter detailing what had occurred on December 11 and noting the pattern of retaliatory behavior by the NCPD as a whole and Sacks and Massaro, in particular.  *Id*. ¶ 131.  The PBA received a "form response" to that letter.  Accordingly, four days later, Losquadro wrote a second letter to Ryder to restate that Volpe's rights under the CBA were being violated.  *Id.* ¶ 132.  In addition, on December 14, 2018, Volpe's wife wrote to Ryder describing what had occurred at their home on December 11 and describing the phone call she received from Internal Affairs while Volpe was gone.  *Id*. ¶ 133.  Ryder promised to investigate the matter.  *Id.*  Yet, according to Volpe, to date, the defendants have not articulated why he was subjected to a drug test.  *Id.* ¶ 45.  Nor has he been provided with the actual test results.  *Id.* ¶ 47.  Volpe was simply informed that his test was "positive."  *Id.*  Volpe complains that pursuant to the CBA, police officers who test positive for drugs are to be notified in person.  *Id.*  Police officers also have the right to have their urine re-tested by a private laboratory and to submit a letter explaining the reason for the positive finding.  *Id.* ¶ 49.  In addition, according to Volpe, the PBA has learned that his urine sample was sent to a private lab for a second test, but the NCPD has not provided him with those results either.  *Id.* ¶ 50.

With respect to the positive findings, Volpe further asserts that he has never taken illegal drugs or prescription drugs without medical authorization.  *Id.* ¶ 51.  Volpe admits, however, that he does take a handful of prescription drugs to treat long-standing medical conditions.  *Id.*  He believes that if his drug test was positive test, it was likely caused by these lawful medications.  *Id.*  Volpe claims, however, that he has been unable to provide the appropriate medical documentation to the NCPD to explain any positive test because the NCPD will not provide him

with the results of his urine tests.  *Id.*

### 8.    The Second Medical Review

On December 28, 2018, Volpe filed a formal complaint with the Nassau County Equal

Employment Opportunity Commission detailing the events surrounding the drug test,

particularly the alleged physical and verbal abuse he endured.  *Id.* ¶ 134.  Around the same time,

McDermott met with Ryder to discuss Volpe's rights and to protest the NCPD's actions.  *Id.* ¶

135.  During two meetings, Ryder lashed out at McDermott, complaining about the PBA's

attempts to petition the NCPD on Volpe's behalf.  *Id.* ¶ 137.  In fact, Ryder complained that

Volpe was a drug abuser and probably a drug dealer.  *Id.*  He even suggested that Volpe had tried

to burn down his own home and that Volpe had beaten his ex-wife.  *Id.*  When questioned about

the call to Volpe's wife during the drug test, Ryder stated that he and Internal Affairs took the

opportunity to question Volpe's wife alone because Volpe was always home.  *Id.* ¶ 138.  Ryder

then added that he believed Volpe was faking the injury.  *Id.* ¶ 140.

Indeed, at a meeting held on January 4, 2019, Ryder stated that he had Volpe drug tested

because Volpe was receiving prescriptions from a doctor on Staten Island and had not used his

workers' compensation number when he filled those prescriptions.  *Id.* ¶ 141.  Ryder did not

explain, however, why the NCPD had allegedly failed to follow "for cause" testing procedures.

*Id.* ¶ 144.  Instead, Ryder continued to claim that Volpe was faking his injury and called him a

"video game champion."  *Id.* ¶ 145.  Volpe believes that Ryder's video game comment evinces

the fact that the NCPD was surveilling his internet accounts in order to further retaliate against

him.  *Id.* ¶ 148.

Then, on January 5, 2019, Volpe received a letter from Ryder, which was dated

December 28, 2018, stating that if Volpe did not contact the County's Legal Department

regarding a deposition in a pending case by January 4, 2019, his indemnification would, once

again, be revoked. *Id.* ¶ 150.  Ryder's letter also stated that Volpe had failed to appear at a

Court-ordered deposition, which Volpe insists was a lie. *Id.* ¶ 151.   Volpe asserts that he first

learned of his deposition on December 28, 2018, and immediately contacted the County

Attorney. *Id.*  The deposition was scheduled for January 14, 2019. *Id.*  Nonetheless, Ryder

insisted that Volpe was not entitled to indemnification because he had not appeared for the

deposition. *Id.* ¶ 152.

On January 25, 2019, the PBA submitted a formal grievance under the CBA regarding

the NCPD's failure to follow department policy or the requirements of the CBA before

administering the drug test. *Id.* ¶ 154.  While the grievance was pending, Volpe received another

medical review from Doctor Enrico S. Mango ("Mango"). *Id.* ¶ 155.  Mango prepared an 11-

page report in which he concluded that Volpe was 100% disabled as a result of the work accident

in October 2016. *Id.*  Mango further opined that Volpe could not return to work in either a full or

restricted duty capacity. *Id.* ¶ 156.

Four days later, McDermott, Losquadro, PBA Sergeant at Arms John Carroll, and the 2nd

Precinct Trustee Ken Cortes met with Ryder and other high-ranking members of the NCPD to

discuss Mango's findings. *Id.* ¶ 159.  At this meeting, the NCPD revealed that they had installed

security camera across the street from Volpe's home and had been videotaping him with

surveillance cameras since the summer of 2018, twenty-four hours a day, seven days a week. *Id.*

¶ 160.  Ryder proceeded to play a tape for about fifteen minutes. *Id.* ¶ 161.  The tape showed

Volpe talking on his cell phone using his injured right hand, carrying a small plastic bag with his

right hand and moving a car seat using his injured hand. *Id.*  According to Volpe, none of the

footage contradicted his claim that he could not work as a police officer due to the injuries. *Id.*

12

Accordingly, the PBA representatives questioned why taxpayer funds were being used to obtain thousands of hours of video surveillance of Volpe at his home.  *Id.* ¶ 163.  In response, Ryder indicated that he was going to issue 110 violations against Volpe for being outside of his house between 9:00 a.m. and 5:00 p.m. and would refer Volpe to the Nassau County District Attorney for insurance fraud if Volpe did not abandon his complaints.  *Id.* ¶ 164.  Following that meeting, the NCPD delivered the surveillance video to Mango and tried to convince him to reassess his medical findings.  *Id.* ¶ 165.  Mango would not do so.  *Id.*

### B.   Procedural History

As stated above, on April 16, 2019, Volpe and the PBA filed the instant action asserting claims under 42 U.S.C. § 1983 and the First, Fourth and Fourteenth Amendments to the United States Constitution.  On November 15, 2019, the defendants filed the instant motion, arguing that the PBA's lone claim of retaliation under the First Amendment must be dismissed because the PBA lacks standing.  The defendants further contend that Volpe's retaliation claim under the First Amendment must be dismissed because he did not speak as a "private citizen" on a matter of "public concern." Moreover, the defendants argue that Volpe's Fourteenth Amendment due process claim must be dismissed because it is factually indistinct from his other Constitutional causes of action.  Finally, the defendants claim that punitive damages cannot be awarded against a municipality.  The motion does not take issue with Volpe's Fourth Amendment search and seizure claim.

### DISCUSSION

### A.   Standards of Law

In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" *See*

*Swiatkowski v. Citibank*, 745 F. Supp. 2d 150, 162 (E.D.N.Y. 2010), *aff'd,* 446 F. App'x 360 (2d Cir. 2011) (citing *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir.2010)).  The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss.  District courts are to first "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679.  Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.*  Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a [d]efendant has acted unlawfully." *Id*. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007) (internal citations omitted)).

### B. The PBA's Standing to Assert a First Amendment Claim

The defendants begin by arguing that the PBA's First Amendment retaliation claim is not justiciable because the PBA lacks standing. "To establish standing in federal court, a party must meet the minimum requirements imposed by Article III of the Constitution by alleging an actual case or controversy." *Buonasera v. Honest Co., Inc*., 208 F. Supp. 3d 555, 560 (S.D.N.Y. 2016). "Specifically, 'a plaintiff must demonstrate that (1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury.'" *Id.* (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)).

As a general rule, an association may have "representational standing" to bring suit on

behalf of its members if it can establish that "(1) its members would otherwise have standing to sue in their own right, (2) the interests at stake are germane to the organization's purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Nassau & Suffolk Cty. Taxi Owners Ass'n, Inc. v. State*, 336 F. Supp. 3d 50, 70–71 (E.D.N.Y. 2018) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 181, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000).  As such, in this Circuit "organizations do not have standing to assert the rights of their members in § 1983 cases because 'the rights [§ 1983] secures to [are] personal to those purportedly injured.'" *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 322–23 (S.D.N.Y. 2018) (quoting *League of Women Voters of Nassau Cty. v. Nassau Cty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984); *Bano v. Uninon Carbide Corp.*, 361 F.3d 696, 714-715 (2d. Cir. 2004) (organization lacked standing where the organization's individuals would have to be involved in the proof of his or her claims).

Nevertheless, an association like the PBA may bring § 1983 claims on its own behalf so long as it can satisfy the three requirements for Article III standing, including establishing that it has suffered an injury that is "distinct and palpable." *Id.* (citing *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017)).  To this end, to plead a perceptible injury, a plaintiff organization must allege that it has suffered an "injury to its activities" or a "drain on its resources" that are sufficiently distinct from the its general organizational mission.  *See Ctr. for Food Safety v. Price*, No. 17-CV-3833 (VSB), 2018 U.S. Dist. LEXIS 155794 at * 9-13 (S.D.N.Y. Sept. 12, 2018); *Centro de la Comunidad Hispana de Locust Valley*, 868 F.3d at 109 (holding the plaintiff organization had sufficiently alleged an injury because the defendant's regulation concerning road-side employment solicitation adversely impacted the organization's ability to organize laborers).

In this case, the PBA argues that its mission of advancing the professional interests of its members has been frustrated by the NCPD's attacks on Volpe.  It also states that it has been forced to divert its resources away from pursuing advocacy efforts, like working for better working conditions, filing grievances or attending hearings, in order to constantly defend Volpe from these attacks.  *See* Pls. Mem. 19-23.  While the complaint certainly details significant actions taken by the PBA on Volpe's behalf, nothing in the complaint suggests that those efforts were taken to the detriment of PBA's mission or its members as a whole.  *C.f. Ragin v. Harry Macklowe Real Estate Co*., 6 F.3d 898, 905 (2d Cir. 1993)(finding OHC was forced to devote significant resources to identify and counteract the defendants' advertising practices and did so to the detriment of their efforts to [obtain] equal access to housing through counseling and other referral services).  Indeed, the PBA simply argues, in its memorandum in opposition to the motion, that "it is reasonable to infer" that its resources could have been spent on countless other activities that would advance the interests of the PBA as a whole had it not been bogged down defending Volpe.  Even at this motion to dismiss stage, the Court finds that some specific allegations of injuries to its activities or diverted resources are required.  *Black Lives Matter*, 354 F. Supp. 3d at 322 ("[n]ew claims not specifically asserted in the complaint may not be considered by courts when deciding a motion to dismiss.").  Accordingly, the undersigned recommends that the defendants' motion to dismiss the PBA's First Amendment claims for lack of standing be granted but that the PBA be given leave to amend the complaint if it can provide factual support of its claim.

### C.    Volpe's First Amendment Claim

The defendants next argue that Volpe's First Amendment retaliation claim must be dismissed because he did not speak out as a citizen on a matter of public concern.  It is well

established in this Circuit that a plaintiff alleging First Amendment retaliation must establish

speech protected by the First Amendment. *Brady v. Cty. of Suffolk*, 657 F. Supp. 2d 331, 341–42

(E.D.N.Y. 2009) (citing *Sousa v. Roque*, No. 07–1892–cv, 578 F.3d 164, 169–70 (2d Cir.2009)).

To this end, "the court must first decide whether the plaintiff was speaking as a 'citizen,' rather

than as a public employee.  If the answer is 'no,' then no First Amendment claim arises, and that

ends the matter." *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 126 S. Ct. 1951, 164 L. Ed. 2d

689 (2006)(internal citations omitted).  "[A]lthough there is no simple checklist or formula by

which to determine whether the employee was speaking as a private citizen or as a public

employee . . . 'the cases distinguish between speech that is the kind of activity engaged in by

citizens who do not work for the government and activities undertaken in the course of

performing one's job.'" *Id.* (quoting *Caraccilo v. The Village of Seneca Falls, N.Y.,* 582 F. Supp.

2d 390, 410 (W.D.N.Y. 2008)).

      In this case, Volpe's speech was made in his capacity as a police officer not as a citizen.

To begin with, it is clear from the complaint that the subject matter of Volpe's speech was

specifically related to his employment.  Indeed, Volpe alleges that the defendants retaliated

against him after he accused Sacks of lying to his personal doctor about his duties and invoked

his right to appeal the Medical Review Board decision.   He further asserts that the retaliation

persisted after the following "speech":  (1) his complaints to Ryder on October 6, 2017, April 26,

2018, July 31, 2018, January 2, 2019, January 4, 2019, and March 19, 2019 (2) his request for a

second medical review in February 2018; (3) his appeal of the County's alleged retraction of his

indemnification and (4) his formal grievance with respect to the drug test.  Each of his request or

complaints involved his rights and obligations as a police officer.  Moreover, the statements were

primarily made to his supervisors.  In fact, other than to his union representative, there is no

indication that Volpe spoke to anyone outside the NCPD about the alleged conduct. *Id.* (citing *Healy v. City of N.Y. Dep't of Sanitation,* 286 Fed. Appx. 744, 746 (2d Cir. 2008) (affirming summary judgment for defendant where plaintiff only reported corruption within the scope of official duties and there was no evidence of external communications)).  Finally, Volpe's speech was initially made in response to the determinations of the NCPD that he was able to return to work.  *See Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 507 (E.D.N.Y. 2011)("Far from resembling anything close to 'activity engaged in by citizens who do not work for the government," the "facts paint a clear picture of an employee speaking out about his views regarding how best to perform his job duties.").  The balance of the speech was a reaction to the alleged retaliatory conduct of the defendants, that being, the NCPD's requirement that he submit to a drug test and its initial determination that he was not entitled to indemnification.  Indeed, nothing about the speech suggests that he was acting outside of the scope of his employment.

Moreover, the Court finds the plaintiffs' reliance on *Matthews v. City of New York*, 779 F.3d 167, 174 (2d Cir. 2015) and *Montero v. City of Yonkers*, New York, 890 F.3d 386, 398 (2d Cir. 2018) misguided.  The *Matthews* case involved a plaintiff police officer's complaint to his precinct's leadership that a quota system was damaging to the department's core mission. *Matthews,* 779 F.3d at 169.  In determining that the speech was protected, the Second Circuit noted that Matthews duties as a policy officer did not involve providing feedback on a policy that implicates a matter of public concern.  Rather, Matthews had engaged in speech in a manner in which ordinary citizens would be expected to engage.  In *Montero*, the Second Circuit found that Montero's criticism of management decisions at two Yonkers PBA meetings was protected speech.  In that case, the Circuit concluded that Montero's union remarks could not be considered "part-and-parcel of his concerns about his ability to properly execute his duties."

Unlike the speech in *Matthews* and *Montero,* Volpe's "speech" involves a personal grievance surrounding his medical review, the defendants' determination that he was not adequately satisfying his job responsibilities and their insistence that he submit to a drug test allegedly for cause.  Indeed, the crux of Volpe's complaint is that the defendants engaged in a "two-year reign of terror" and waged a personal "vendetta" against Volpe because he challenged their determination that he was able to return to work.  Accordingly, the Court finds Volpe was not speaking as a private citizen.

In addition, even if Volpe was acting as a private citizen, Volpe's speech was not a matter of public concern.  Whether a public employee's speech addresses a matter of public concern is a question of law that "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48, 148 n.7 (1983).  A statement is a matter of public concern when it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id*. at 146.  On the other hand, "speech on a purely private matter, such as an employee's dissatisfaction with the conditions of his employment," does not implicate the First Amendment. *Lewis v. Cowen*, 165 F.3d 154, 164 (2d Cir. 1999); Montero, 890 F.3d at 399 ("speech that principally focuses on an issue that is 'personal in nature and generally related to the speaker's own situation is not a matter of public concern).  Thus, in assessing whether an employee's speech involves a matter of public concern, "[t]he heart of the [inquiry] is whether the employee's speech was "calculated to redress personal grievances or whether it had a broader public purpose.'" *Ruotolo v. City of N.Y.*, 514 F.3d 184, 189 (2d Cir. 2008) (quoting *Lewis,* 165 F.3d at 163-64).  Volpe argues that his speech touches on a matter of public concern because of its implications for both for the [NCPD's] labor policies as well as its ability to carry out its function of protecting the public.  The undersigned disagrees.

Volpe's complaints addressed his own situation and viewed, in context, were certainly of a purely private nature.  Accordingly, the undersigned respectfully recommends that the defendants' motion to dismiss Volpe's First Amendment retaliation claim on the basis of a lack of protected speech be granted.

### D.  Volpe's Due Process Claim

In his first cause of action, Volpe asserts that he has been denied substantive due process because the defendants violated his right to privacy, personal autonomy and freedom from arbitrary governmental harassment in a conscious-shocking manner.  Specifically, Volpe alleges that the defendant's engaged in a campaign of harassment for two years, which included (1) harassing his family at his home and on his days off; (2) baselessly denying him indemnification; (3) depriving him of his sick leave despite a determination that he was disabled; (4) interfering with his relationship with his personal doctor; (5) forcing him to submit to an unlawful and involuntary drug test; (5) engaging in months of constant surveillance at his home and on the internet; and (6) making numerous defamatory comments about him.  While substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, it does not protect against government action that is incorrect or ill-advised. *Cunney v. Bd. of Trustee of Village of Grand View, N.Y.,* 660 F.3d 612, 626 (2d Cir. 2011) (citing *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)).  In fact, substantive due process does not forbid all arbitrary or capricious – action that is correctable in a state court lawsuit.  *See Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 505 (2d Cir. 2001).  "[Its] standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."

Moreover, courts have been reluctant to expand the concept of substantive due process.

20

*See Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (1989).  Indeed, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing [a parties'] claims." *Albright v. Oliver*, 510 U.S. 266, 273, 114 S. Ct. 807, 813, 127 L. Ed. 2d 114 (1994) (quoting *Graham v. Connor*, supra, at 395, 109 S. Ct. at 1871).  In this case, Volpe has asserted the same allegation in support of his First Amendment retaliation and Fourth Amendment unlawful search and seizure claims.  Since the First and Fourth Amendments must be the guide for analyzing his claims, "'[i]t would be a waste of resources to permit these claims under the Fourteenth Amendment, as well as improper, given the Supreme Court's direction that substantive due process analysis is not available where a more specific constitutional standard is directly applicable.'" *Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 251–52 (E.D.N.Y. 2010), on reconsideration in part, 814 F. Supp. 2d 242 (E.D.N.Y. 2011)(quoting *Hickey v. City of N.Y.*, No. 01 Civ. 6506 (GEL), 2004 WL 2724079, at * 18 (S.D.N.Y. Nov. 29, 2004); *see also Simons v. New York,* 472 F. Supp. 2d 253, 265 (N.D.N.Y.2007) (dismissing substantive due process claim where the Fourth Amendment provided an explicit textual source of protection against pretrial deprivations of liberty, including false arrest, and was thus, the proper guide for analyzing plaintiffs' constitutional claims, not the Fourteenth Amendment).  Accordingly, as a substantive due process analysis would be inappropriate, the undersigned further recommends that Volpe's substantive due process claim be dismissed.

### E.    Volpe's Claim for Punitive Damages

Finally, it is well established that municipalities are immune from punitive damages under 42 U.S.C. § 1983.  *See Newport v. Fact Concerts*, 453 U.S. 247, 271 (1981) (holding that

municipalities are immune from punitive damages under 42 U.S.C. § 1983 based on a finding

that immunity is compatible with the purposes of § 1983 and general principles of public

policy).  Indeed, "[t]he general rule today is that no punitive damages are allowed unless

expressly authorized by statute." *Cook Cty. v. United States ex rel. Chandl*er, 538 U.S. 119, 129,

123 S. Ct. 1239, 155 L. Ed. 2d 247 (2003) (quoting *Fact Concerts*, 453 U.S. at 260, n.2); *see*

*also Cross v. N.Y.C. Transit Authority*, 417 F.3d 241, 257 (2d Cir. 2005)(Second Circuit

applying rule in ADEA case).  Accordingly, to the extent Volpe is seeking punitive damages as

against the County, the undersigned recommends that that claim be dismissed.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically served by the Court

on the parties.  Any objections to this Report and Recommendation must be filed with the Clerk

of the Court with a courtesy copy to the undersigned within 14 days.  Failure to file objections

within this period waives the right to appeal the District Court's Order.  See 28 U.S.C. §

636(b)(1); Fed R. Civ. P 72; *Mejia v. Roma Cleaning, Inc*., No. 17-3446, 2018 U.S. App. LEXIS

28235, 2018 WL 4847199, at *1 (2d Cir. Oct. 5, 2018) ("Plaintiff has waived any objections to

the Magistrate's finding" by failing to timely object); *Wagner & Wagner, LLP v. Atkinson,*

*Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010); *Beverly v.*

*Walker,* 118 F.3d 900, 902 (2d Cir. 1997).


Dated:  Central Islip, New York
       October 16, 2020

                                       /s
                                ARLENE R. LINDSAY
                                United States Magistrate Judge