# EXHIBIT H

ORIGINAL

## In the Matter Of:

CHARLES VOLPE vs POLICE DEPARTMENT

19CV2236(JMA)(JMW)

## DEPUTY INSPECTOR JOSEPH MASSARO

*March 02, 2022*



800.211.DEPO (3376)
EsquireSolutions.com

1

2                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
3    - - - - - - - - - - - - - - - - - - - - - - - -
     CHARLES VOLPE,
4
              Plaintiff,
5
                        Index No. 19CV2236(JMA)(JMW)
6    v.

7    PATRICK RYDER, COMMISSIONER OF THE NASSAU COUNTY
     POLICE DEPARTMENT, in his official and individual
8    capacities; RUSSELL SACKS, SERGEANT IN THE NASSAU
     COUNTY POLICE DEPARTMENT, in his individual
9    capacity; JOSEPH MASSARO, LIEUTENANT IN THE
     NASSAU COUNTY POLICE DEPARTMENT, in his
10   individual capacity; and COUNTY OF NASSAU,

11            Defendants.
     - - - - - - - - - - - - - - - - - - - - - - - -
12

13   Remote Deposition Upon Oral Examination of:

14                    Deputy Inspector Joseph Massaro

15

16
     Date:              March 2, 2022
17

18
     Time:              10:00 a.m.
19

20   Reported By:    CHRISTINE VIGNA

21                   Alliance Court Reporting, Inc.

22                   109 South Union Street, Suite 400

23                   Rochester, New York 14607

24

25



```
 1
 2                    A P P E A R A N C E S
 3   Appearing Remotely on Behalf of Plaintiff:
 4   Gina M. Arnedos, Esq.
 5       Steven F. Goldstein LLP
 6       One Old Country Road, Suite 318
 7       Carle Place, New York  11514
 8       garnedos@sfgllp.com
 9
10   Appearing Remotely on Behalf of Defendants:
11   Matthew J. Mehnert, Esq.
12       Lamb & Barnosky LLC
13       534 Broadhollow Road, #210
14       Melville, New York  11747
15       mjm@lambbarnosky.com
16                    *        *        *
17
18
19
20
21
22
23
24
25
```



```
 1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

 2         Q.   Were you a detective lieutenant in 2016?

 3         A.   No.

 4         Q.   What was your rank in 2016?

 5         A.   Detective sergeant.

 6         Q.   Okay.  And you were promoted to deputy

 7    inspector when?

 8         A.   In March of 2020.  I was promoted to

 9    captain and designated deputy inspector.

10         MS. ARNEDOS:  Off the record for a second.

11         (There was a discussion off the record.)

12         Q.   Inspector, in December of 2018, were you

13    designated as detective lieutenant?

14         A.   Yes.

15         Q.   Okay.  And what was your command?

16         A.   Medical administration office.

17         Q.   And when did you first get assigned to the

18    MAO?

19         A.   June 2017.

20         Q.   And when you were assigned to that command

21    in June 2017, what were your day-to-day

22    responsibilities?

23         A.   I was responsible for reviewing aided

24    packages, which are injury, illness to officers.  I

25    was responsible for reviewing and endorsing motor
```



1      DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2    vehicle accidents of Nassau County police cars.  I was

3    responsible for drug testing.  I was responsible for

4    conducting sick leave checks.

5           Q.  Anything else?

6           A.  There are -- there's additional

7    administrative functions.  I was responsible for

8    ensuring that injured officers made appropriate

9    appointments with the chief surgeon's office and

10   attended those appointments, that they followed the

11   sick leave policy and procedures.

12          Q.  Anything else?

13          A.  No.

14          Q.  All right.  How many years do you have on

15   the force?

16          A.  I believe 17 now.

17          Q.  All right.  Are you familiar with Police

18   Officer -- retired Police Officer Charles Volpe?

19          A.  Yes.

20          Q.  And how did you first become aware of or

21   familiar with Police Officer Volpe?

22          A.  I became aware of him while assigned to

23   medical administration office.

24          Q.  And what was Police Officer Volpe's

25   relation to the MAO at that time?



```
 1        DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS
 2            A.  There was correspondence written to him
 3     notifying him that he was designated as a
 4     sick -- chronic sick leave abuser.
 5            Q.  Okay.  Thank you.
 6                Was that correspondence sent to his home
 7     or was it sent via interdepartmental mail?
 8            A.  I don't recall the manner in which the
 9     correspondence was sent.
10            Q.  While Officer Volpe was out on sick leave,
11     did he have access to his department email if you
12     know?
13            A.  Department email is accessible while not
14     in department facilities.  You can access it outside
15     of the department facilities.
16            Q.  To your knowledge, was Officer Volpe ever
17     locked out of his email?
18            A.  I do not know.
19            Q.  Do you know what command or department
20     would make that decision?
21                MR. MEHNERT:  Objection.
22                The witness can answer.
23            Q.  Only if you know.
24            A.  No.
25            Q.  Okay.  Do you recall when your last sick
```



```
 1       DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS
 2   leave visit was to Officer Volpe's home?
 3           A.   December 11, 2018.
 4           Q.   And what was the purpose of that visit?
 5           A.   To order Officer Volpe into police
 6   headquarters.
 7           Q.   For what reason?
 8           A.   For a drug test and medical evaluation.
 9           Q.   Was Sergeant Sacks with you on that visit?
10           A.   Yes.
11           Q.   Do you recall what time of day that was?
12           A.   Approximately 4:30 p.m.
13           Q.   And was that drug test for cause or
14   random?
15           A.   That drug test was for cause.
16           Q.   And what was the basis for that?
17           A.   Could you clarify the question?
18           Q.   Yes.
19                What was that cause?
20           A.   That cause was for the reasonable
21   suspicion that he was abusing prescription medication.
22           Q.   And from what events or situations did
23   that reasonable suspicion arise?  What was the basis
24   for that reasonable suspicion?
25           A.   I can only go on what I was made aware of.
```



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2    responded to Officer Volpe's home the night of the

3    drug test, did you order him to accompany you and

4    Sergeant Sacks in your vehicle or was he ordered to

5    drive his own vehicle?

6           A.   He was told he could drive himself.

7           Q.   Okay.  And did he do that?

8           A.   Yes.

9           Q.   Okay.  Did you and Sergeant Sacks meet him

10   at headquarters?

11          A.   Yes.

12          Q.   Okay.  And where did Officer Volpe first

13   go when you all arrived at headquarters?

14          A.   Can you clarify?

15          Q.   Where did you have him report when he got

16   there, was it to the MAO, the chief surgeon's office,

17   someplace else?

18          A.   I don't recall if it was MAO, the medical

19   administration office or the chief surgeon's office.

20          Q.   Okay.  And can you tell me what happened

21   when you and Sergeant Sacks and Officer Volpe first

22   arrived?

23          A.   Can you be more specific?

24          Q.   Yeah.

25               What was the first thing that happened



```
 1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS
 2   when you all got to headquarters?
 3        A.  We walked through the parking lot towards
 4   the building.
 5        Q.  And when you got inside the building?
 6        A.  We went upstairs to the wing where the
 7   medical administration office is.  I don't recall what
 8   the first thing or office I went into or did was
 9   during that time.
10        Q.  Okay.  At some point after you arrived
11   there, did you direct Officer Volpe into an area where
12   the drug test was going to occur?
13        A.  Yes.
14        Q.  And was that the men's room?
15        A.  Yes.
16        Q.  And was the men's room on the floor where
17   the MAO and the chief surgeon's office were located?
18        A.  Yes.
19        Q.  Who went to the men's room at that time?
20        A.  Can you be more specific on the time?
21        Q.  When you first went into the men's room
22   with Officer Volpe, who else was there?
23        A.  Officer Volpe, Detective Sergeant Sacks
24   and Officer Losquadro.
25        Q.  Were you present?
```



```
 1        DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

 2             A.  Yes.

 3             Q.  And what occurred when you first -- when

 4    you first all got into the men's room?

 5             A.  Officer Volpe was directed to the area

 6    where we conduct the drug test.

 7             Q.  And where was that?

 8             A.  In the men's room.

 9             Q.  Where in the men's room?

10             A.  Against a wall where there is a shelf

11    where we put the random drug testing for -- for-cause

12    drug testing sample cups and documentation.

13             Q.  And was that in the area of the urinals?

14             A.  Yes.

15             Q.  And was Officer Volpe given any direction

16    at that time?

17             A.  Yes.

18             Q.  And what was that?

19             A.  Can you be more specific?

20             Q.  What direction was Officer Volpe given at

21    the point where he was directed to the wall with the

22    shelf?

23             A.  He was directed on the procedure to submit

24    to the drug test.

25             Q.  And what was that procedure?
```

```
 1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS
 2         A.   The procedure was to take the sample cup,
 3    utilize the sample cup to urinate into.  And then when
 4    he was done, he would return that sample cup to the
 5    work space that the split sample were at.
 6         Q.   What is a split sample?
 7         A.   Within our drug testing supplies there's
 8    what's called a split specimen cup.  Therefore, there
 9    is a large cup to capture the urine, two smaller cups
10    that the sample is broken down into, as well as a
11    sample bag in that large cup.
12         Q.   And whose responsibility is it to transfer
13    the urine from the large specimen cup to the smaller
14    specimen cups?
15         A.   I don't know that it's anyone's
16    responsibility to transfer it.  It is on the medical
17    administration office to ensure that it's successfully
18    transferred.
19         Q.   So would that be done by a police
20    department employee or would it be done by Officer
21    Volpe?
22         A.   In this case -- could you be more specific
23    to -- in generalities or in this case?
24         Q.   Well, first in generalities.
25         A.   It could be done by either a member being
```



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2    paperwork.  One copy goes into the sample bag,

3    specimen bag that's now labeled A with the A vial and

4    they are put in there.  The other specimen bag is

5    already labeled B.  The paperwork is put into the B

6    specimen bag and the B vial is then put into that.

7            In the presence of the subject, the

8    medical administration officer will remove the

9    adhesive covering from the specimen bag and seal it in

10   front of the subject ensuring that it's properly

11   sealed and nothing could fall out of it.

12           Q.  Understood.  Thank you.

13           Okay.  Were all of these procedures

14   followed during the drug test of Officer Volpe?

15           A.  Yes.

16           However, the first attempt to urinate was

17   unsuccessful.  Therefore, he was given an opportunity

18   to go back to the office to await the need to urinate.

19           Therefore, he was told to dispose of the

20   split specimen cup and the two smaller vials that were

21   in that split specimen cup in the garbage.  The

22   paperwork was still intact.  The A and B labels were

23   still on that paperwork.

24           Q.  Okay.

25           A.  That paperwork was brought back with him



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2    to the medical administration office.  So thereby, the

3    split specimen cup could not be tainted and we

4    wouldn't leave it open for environmental conditions to

5    taint what is in that cup.

6            The next attempt would require him to

7    choose at his discretion whatever other split specimen

8    cup from the shelf in the MAO and then return to the

9    bathroom to attempt to urinate again.

10           Q.  And did that occur, the second attempt?

11           A.  The second attempt did occur.

12           Q.  And was that successful?

13           A.  No.

14           Q.  And was that same procedure followed with

15   regard to discarding the cup and the vials?

16           A.  The second attempt I instructed him to

17   dispose of the vials and the cup in the red biohazard

18   bin that is on the floor of the men's bathroom, which

19   is right next to the general waste garbage can in that

20   bathroom.

21           Officer Volpe, on the second attempt, did

22   not place the cups into the red biohazard bin as

23   instructed.  He placed it on top of the overflowing

24   garbage on top of paper towels.

25           Q.  And did you say anything in response to



1      DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2    that?

3          A.  As I was exiting the bathroom, I observed

4    that there was an unknown substance in that cup.

5          Q.  And what did you do in response to that?

6          A.  I stated to Officer Volpe, "I thought you

7    said you didn't spit in the cup."

8          Q.  And did he have a response?

9          A.  Officer Volpe said, "I didn't."

10              And Officer Losquadro said, "What is the

11   big deal if he spit in the cup?  It's not going to

12   affect the test."

13         Q.  Did you respond to Officer Losquadro?

14         A.  Not that I recall.

15         Q.  Did you retrieve the cup which you believe

16   Officer Volpe spit in from the trash?

17         A.  Yes.

18         Q.  When you did that, were there other

19   specimen cups in the trash?

20         A.  I don't know.  There was at least the two

21   vials that he threw out in addition to the larger

22   urine capture cap.

23         Q.  I understand that.

24              I'm asking, were there other cups not

25   belonging to Officer Volpe?



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2        A.   No.  Not that I know of.

3        Q.   Okay.  So were you able to identify that

4    particular cup as the one that Officer Volpe put on

5    top of the paper towels in the trash can?

6        A.   Yes.

7        Q.   Okay.  Take me through what happened next.

8        A.   He was instructed to go back to the

9    medical administration office.  And I contacted my

10   superior.

11       Q.   And who was that?

12       A.   At the time, it was Chief Keechant Sewell.

13       Q.   Can you spell the last name?

14       A.   S-E-W-E-L-L.

15       Q.   And what was the reason for your

16   contacting Chief Sewell?

17       A.   To notify her of the fact that I had heard

18   Officer Volpe in the bathroom pulling up phlegm and

19   coughing up from his throat what sounded like phlegm

20   and mucus and I had heard him spit.  And upon leaving

21   the bathroom, I observed his cup on the top of the

22   garbage can with an unknown substance.

23       Q.   And did Chief Sewell have any response to

24   what you told her?

25       A.   Yes.



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2         Q.  And what was that?

3         A.  I don't recall the exact response.  But

4    the result was that two supervisors from the internal

5    affairs unit responded to the medical administration

6    office.

7         Q.  And what was the purpose of that?

8         A.  I can't speak for what -- the purpose of

9    her sending those supervisors up.

10        Q.  Okay.  At any point during the time after

11   the first attempt and the second attempt, did Officer

12   Volpe ask for water?

13        A.  Not that I recall.

14        Q.  At any point after the first attempt and

15   after the second attempt, did anyone from MAO give

16   Officer Volpe water?

17        A.  Upon arrival at the medical administration

18   office originally, I gave Officer Volpe -- excuse me

19   one second.  I'm just trying to recall.

20        Q.  Sure.  Yeah.

21        A.  After the first attempt when Officer Volpe

22   was unable to provide a sample, I told him that I

23   would get him a bottle of water.  And I offered

24   Officer Losquadro a bottle of water also.

25        Q.  And did Officer Volpe drink that water?



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2         A.   To my knowledge, yes.  That was a

3    16.9-ounce bottle of water assuming Kirkland hasn't

4    changed the size of their bottles.

5         Q.   Okay.  What about after the second

6    attempt, was Officer Volpe given more water?

7         A.   Not that I know of.

8         Q.   And was there a point where Officer Volpe

9    indicated to you or someone else that he would make a

10   third attempt to give you the sample?

11        A.   A third attempt was made.  I don't

12   recall -- when you say he indicated, I don't recall

13   the origination of the third attempt, if we asked him

14   if he was ready or if he told us that he was ready.

15        Q.   Okay.  In any event, there was a third

16   trip to the men's room?

17        A.   Yes.

18        Q.   Okay.  And before moving to the men's

19   room, did Officer Volpe take another specimen cup,

20   split specimen cup?

21        A.   Before the third attempt, I had instructed

22   Officer Losquadro or I informed Officer Losquadro that

23   on the third attempt Officer Volpe was not going to be

24   able to face the urinals.  And I had told him the

25   reason for that and I had explained to him.  And then

1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2   we walked, I believe, from my section of the medical

3   administration office towards Officer Volpe where he

4   was given the opportunity.  And he did select a third

5   specimen cup.

6        Q.  And what was the reason given to Officer

7   Losquadro for Officer Volpe not being able to face the

8   urinals?

9        A.  I don't recall if I gave a reason to

10  Officer Losquadro.  I don't recall if I gave the

11  reason.

12       Q.  So you may have just informed him that

13  Officer Volpe would not be permitted to face the

14  urinals?

15       A.  To ensure that we were able to observe or

16  I was able to observe the sample being collected.

17       Q.  Was there a window in that men's room?

18       A.  Yes.

19       Q.  And how did that window open?  Did it open

20  from the bottom, the top, slide up and down or open

21  out?

22       A.  If you don't mind, I'll describe it.

23       Q.  That would be fine.

24       A.  I'd say it opened from the bottom.

25       Q.  I understand.



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2         A.   There were two hinges on the side.  The

3    bottom of the window stays where it is and the top of

4    the window, which is frosted glass, will lean in

5    towards the bathroom.  So, therefore, it's tilted in

6    towards the bathroom from the top and slanted down

7    towards the window frame at the bottom where the

8    window meets the window frame.

9         Q.   Got it.  Thank you.

10             About how high up from the floor was the

11   window?

12        A.   The window is probably about 18-inches

13   high.  So I would assume it starts at about no less

14   than 3 feet and probably goes up to almost 4 and a

15   half feet off the ground.

16        Q.   So the bottom of the window was how high?

17        A.   Probably 3 and a half feet, which is just

18   at -- it's just essentially a closed window at that

19   point.

20        Q.   Right.  I understand.

21             Where was the window relative to the urinals?

22        A.   The urinals are against the wall.  When

23   you enter the bathroom, there are, I believe, three

24   bathroom stalls on the left side.  After you get

25   through a double door -- I apologize.  There is a



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2    double door -- then you get to the three bathroom

3    stalls and then three urinals on the left side of that

4    wall, which is facing north.  The bathroom window is

5    facing east in the center of the eastern wall.

6          Q.  So the orientation between the window and

7    the urinals, am I correct that if you're looking at

8    the window, the urinals would be on your left?

9          A.  Yes.

10          Q.  Okay.  Now, did you instruct Officer Volpe

11    on where to stand to give you a sample on that third

12    attempt?

13          A.  I instructed Officer Volpe that he only

14    couldn't stand and face the urinals which would block

15    our view from witnessing the sample and specimen cup.

16    I instructed him that he could face any other

17    direction he would like.  That's it.

18          Q.  Okay.  Was Officer Volpe ever instructed

19    to stand in front of the window specifically?

20          A.  Absolutely not.

21          Q.  Did Officer Volpe face the window when he

22    was giving -- attempting to give that sample?

23          A.  Yes.  He faced the window.

24          Q.  Did Sergeant Sacks ever instruct Officer

25    Volpe to face the window?

1       DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2            A.  No.

3            Q.  Just to back up a moment.  On that third

4       attempt, who was in the men's room?

5            A.  Who was in the men's room, on my left

6       shoulder and his right shoulder, was Officer

7       Losquadro.  And then next to Officer Losquadro was

8       Detective Sergeant Sacks, Detective Sergeant Choo and

9       his rank at that time was Detective Sergeant Belistry.

10           Q.  And were Detective Sergeant Choo and

11      Belistry the supervisors from IAU?

12           A.  Yes.

13           Q.  Did everyone in the men's room have a full

14      view of Officer Volpe to your knowledge?

15           A.  To my knowledge, no.

16           Q.  Who had view of Officer Volpe?

17           A.  I know that I had view of Officer Volpe.

18      I know that Officer Losquadro had view of Officer

19      Volpe.  I can't speak for anyone else.

20           Q.  Did anyone that was present in the men's

21      room for that third attempt go into a stall?

22           A.  Not that I know of.

23           Q.  On that third attempt, did Detective Sacks

24      say anything at all to Officer Volpe?

25           A.  No.  Not that I know of.



1    DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

2         Q.  On that third attempt in the men's room,

3    did either of the supervisors from internal affairs

4    speak to Officer Volpe?

5         A.  Not that I know of.

6         Q.  Did Officer Losquadro speak at all while

7    you were in the men's room for that third attempt?

8         A.  Not that I recall.  Or I don't recall

9    anything he might have said if he did.  And

10   regardless, I don't recall.

11        But are we referring to the attempt of

12   gaining that specimen or after when the sample is

13   being split up?

14        Q.  I'm just speaking first in general while

15   you were all in the men's room.

16        A.  No.  The only one that spoke anything to

17   him was myself.

18        Q.  Okay.  Was Officer Volpe able to give a

19   sample on that third attempt?

20        A.  Yes.

21        Q.  And was the procedure for splitting up the

22   sample, labeling the tubes, labeling the bags,

23   etcetera, followed?

24        A.  Yes.  I was the one with Officer Volpe.

25   And Officer Losquadro witnessing that conducted, the



```
 1      DEPUTY INSPECTOR JOSEPH MASSARO - BY MS. ARNEDOS

 2          Q.  At any point after the evening of the drug

 3   test.  Let me ask a different question.

 4              At some point did you receive

 5   communication, written or otherwise from the chief

 6   surgeon's office that Officer Volpe could return on

 7   restricted duty?

 8          A.  We're still talking about after the

 9   December 11, 2018?

10          Q.  Correct.

11          A.  No.  I don't recall him being ordered back

12   to work RA at that time.

13          Q.  What about before the drug test, do you

14   recall it then?

15          A.  I was not in the medical administration

16   office.  But in April of 2017, he was found fit for

17   restricted assignment.

18          Q.  That was before you got there?

19          A.  Yes.

20          Q.  And do you have any knowledge of whether

21   Officer Volpe returned restricted assignment?

22          A.  It's my understanding that between his

23   October 4th of 2016, date and through 2018 he did not

24   return to work in any capacity.

25          Q.  And while you were assigned to the MAO,
```



1

2                    A C K N O W L E D G M E N T

3              I, Deputy Inspector Joseph Massaro,

4    declare, swear and aver that I have read my testimony

5    contained herein and that my answers are true and

6    correct, with any exceptions noted on the errata

7    sheet, under penalty of perjury.

8                    _____

9                    Deputy Inspector Joseph Massaro

10

11

12          I certify that this transcript was signed

13   in my presence by Deputy Inspector Joseph Massaro on

14   the _____ day of _____, 2022.

15

16          IN WITNESS WHEREOF, I have hereunto set my

17   hand and affixed my seal of office of _____

18   on this _____ day of _____, 2022.

19

20                    _____

21                    Notary Public

22

23                    _____

24                    My Commission Expires:

25



```
 1
 2                 C E R T I F I C A T I O N
     STATE OF NEW YORK:
 3   COUNTY OF MONROE:

 4            I, CHRISTINE VIGNA, do hereby certify that

 5   the foregoing testimony was duly sworn to; that I

 6   reported in machine shorthand the foregoing pages of

 7   the above-styled cause, and that they were produced by

 8   computer-aided transcription (CAT) under my personal

 9   supervision and constitute a true and accurate record

10   of the testimony in this proceeding;

11            I further certify that the witness does

12   request to review the transcript;

13            I further certify that I am not an

14   attorney or counsel of any parties, nor a relative or

15   employee of any attorney or counsel connected with the

16   action, nor financially interested in the action;

17            WITNESS my hand in the City of Rochester,

18   County of Monroe, State of New York.

19
20

     CHRISTINE VIGNA

23   Freelance Court Reporter and

     Notary Public No. 01KE6093245

24   in and for Monroe County, New York

25
```

