UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CHARLES VOLPE *et. al.*,


                          Plaintiffs,                              **OPINION
                                                                   AND ORDER**

                                                                   19-cv-02236 (JMW)

             -against-


PATRICK RYDER *et. al.*,


                          Defendants.

------------------------------------------------------------------X

**A P P E A R A N C E S:**

Gina M. Arnedos, Esq.
Steven F. Goldstein, Esq.
**Wade Clark Mulcahy LLP**
One Old Country Road, Suite 318
Carle Place, NY 11514
*Attorneys for Plaintiff*

Michelle S. Feldman, Esq.
Gia Foster, Esq.
Scott M. Karson, Esq.
Richard K. Zuckerman, Esq.
**Lamb & Barnosky, LLP**
534 Broadhollow Road
Melville, NY 11747
*Attorneys for Defendant Ryder*

Michelle S. Feldman, Esq.
Scott M. Karson, Esq.
Richard K. Zuckerman, Esq.
**Lamb & Barnosky, LLP**
534 Broadhollow Road
Melville, NY 11747
*Attorneys for Defendants Sacks, Massaro, and County of Nassau*

Matthew J. Mehnert, Esq.
**Guercio & Guercio, LLP**
77 Conklin Street
Farmingdale, NY 11735
*Attorney for Defendants Ryder, Sacks, Massaro, and County of Nassau*

**WICKS,** Magistrate Judge:

Plaintiff, Charles Volpe, asserts a single claim against Defendants Patrick Ryder,

Commissioner of the Nassau County Police Department, in his official and individual capacities;

Russell Sacks, Sergeant in the Nassau County Police Department in his individual capacity;

Joseph Massaro, Lieutenant in the Nassau County Police Department ("NCPD"), in his

individual capacity; and the County of Nassau.  Specifically, he alleges that Defendants violated

his Fourth Amendment right pursuant to the United States Constitution when they subjected him

to a drug test while on sick leave from a line-of-duty injury.

Before the Court is Defendants' Motion for Summary Judgment to dismiss the Amended

Complaint in its entirety (ECF No. 144).  For the reasons that follow, Defendants' motion is

GRANTED.

## UNDISPUTED MATERIAL FACTS[1]

The following facts are taken from Defendants' 56.1 statement.  On December 11, 2018,

Plaintiff Volpe was administered a drug test at the NCPD headquarters in Mineola.  (ECF No. 82

¶ 59.)  The test was administered at the authority of Commissioner Ryder, pursuant to

Commissioner's Procedural Order 8-95, which authorizes testing of NCPD members for cause

upon reasonable suspicion of drug abuse.  (ECF No. 145-5 at 6-11) ("Ryder Dep. Tr."); (ECF

No. 145-10 at 4) ("Commissioner's Procedural Order").  The Commissioner's Procedural Order

8-95 defines Drug Abuse as follows:

> **Drug Abuse** - The term "Drug Abuse" shall include the use of a controlled substance or
> marihuana, which has not been legally prescribed and/or dispensed, and the improper or
> excessive use of a legally prescribed drug.

(*Id.* at 2.)  The Commissioner's Procedural Order 8-95 defines "Reasonable Suspicion" as

follows:

> **Reasonable Suspicion** - Reasonable Suspicion that a member is abusing drugs exists
> when objective facts and observations are brought to the attention of a Superior Officer
> and based upon the reliability and weight of such information he/she can reasonably infer
> or suspect that a member of the Department is abusing drugs. Reasonable Suspicion must
> be supported by specific articulatable facts which may include, but are not limited to:

---

[1] Unless otherwise noted, a standalone citation to a party's Rule 56.1 statement throughout this Opinion means that the Court has deemed the underlying factual allegation undisputed.  Any citation to a Rule 56.1 statement incorporates by reference the documents cited in it.  Where relevant, however, the Court may cite directly to an underlying document.  The Court has deemed true undisputed facts averred in a party's Rule 56.1 statement to which the opposing party cites no admissible evidence in rebuttal.  *See Stewart v. Fashion Inst. of Tech*., No. 18-cv-12297 (LJL), 2020 WL 6712267, at *8 (S.D.N.Y. Nov. 16, 2020) ("[P]ursuant to Local Civil Rule 56.1 [the movant's] statements are deemed to be admitted where [the non-moving party] has failed to specifically controvert them with citations to the record.") (quoting *Knight v. N.Y.C. Hous. Auth*., No. 03-cv-2746 (DAB), 2007 WL 313435, at *1 (S.D.N.Y. Feb. 2, 2007)); *Lumbermens Mut. Cas. Co. v. Dinow*, No. 06-CV-3881 (TCP), 2012 WL 4498827, at *2 n.2 (E.D.N.Y. Sept. 28, 2012) ("Local Rule 56.1 requires . . . that disputed facts be specifically controverted by admissible evidence. Mere denial of an opposing party's statement or denial by general reference to an exhibit or affidavit does not specifically controvert anything.").  Further, to the extent a party improperly interjects arguments and/or immaterial facts in response to facts asserted by the opposing party, and does not specifically controvert such facts, the Court disregards those statements. *See McFarlane v. Harry's Nurses Registry*, No. 17-CV-06350 (PKC) (PK), 2020 WL 1643781, at *1 n.1 (E.D.N.Y. Apr. 2, 2020) (quoting *Risco v. McHugh*, 868 F. Supp. 2d 75, 85 n.2 (S.D.N.Y. 2012)).

reports and observations of the member's drug related activities, i.e., purchase, sale or possession of drugs, associations with known drug dealers or users, observations of the member at known drug related locations, etc.; an otherwise unexplained change in the member's behavior or work performance; and observed impairment of the member's ability to perform his duties.

(*Id.* at 3.)[2]

Prior to authorizing the administration of the test, Commissioner Ryder was advised that Plaintiff suffered a line of duty injury to his right hand on October 4, 2016, and remained on sick leave due to that injury for more than two years, until after the December 11, 2018 drug test, and during that time, Volpe was taking hydrocodone, a prescription pain killer, on a daily basis. (ECF No. 145-6 at 5-8) ("Volpe Dep. Tr."). Commissioner Ryder was advised that Volpe told a Department Surgeon that he was unable to move his right hand, but Volpe was seen the same day using his right hand. (Ryder Dep. Tr. at 10.) In addition, subsequent to the date of Volpe's right-hand injury, but prior to the date of administration of the drug test, Volpe was observed using his right hand to: put up Christmas decorations at his home; install a child's car seat in his car; drag garbage cans between his house and the street; and operate his mobile phone. (ECF No. 145-7 at 6) ("Sacks Dep. Tr."). Ryder was also advised that at a hearing on Volpe's application for benefits, Volpe was observed by the hearing officer, Deputy Chief Ronald Walsh, to be sweating "profusely," and his eyes appeared to be "sunken," causing the hearing officer to suspend the hearing and report to Commissioner Ryder that the hearing could not continue because "something's wrong" with Volpe. (Ryder Dep. Tr. at 10.) Volpe testified at the hearing that, since the date of his hand injury, he had been taking Vicodin four times per day and Percocet once daily. (ECF No. 145-11 at 4-7.) ("Transcript of Benefits Hearing"). A Department Surgeon reported to Commissioner Ryder that the amount of pain medication being

---

[2] The Commissioner's Procedural Order does not discuss whether these testing procedures apply to non-safety sensitive personnel, or off-duty officers or those on sick leave.

taken by Volpe exceeded that which was necessary and appropriate for an injury of the severity

and duration of Volpe's hand injury.  (Ryder Dep. Tr. at 10-11); (Sacks Dep. Tr. at 8.)

On December 11, 2018, Deputy Inspector Massaro was the Commanding Officer of the

NCPD Medical Administration Office ("MAO").  (ECF No. 145-8 at 5) ("Massaro Dep. Tr.").

Det. Sgt. Sacks was the Deputy Commanding Officer of the MAO.  (Sacks Dep. Tr. at 18.)

Massaro and Sacks drove from NCPD Headquarters to Volpe's home to order him to return to

NCPD headquarters for administration of a drug test for cause based on reasonable suspicion that

Volpe was abusing prescription medication.  (Sacks Dep. Tr. at 9); (Massaro Dep. Tr. at 8.)

Upon Volpe's arrival at NCPD headquarters, he was directed to the MAO and then to the

men's room located on the second floor of the building, across the hall from the MAO and the

Chief Surgeon's office.  (Sacks Dep. Tr. at 10); (Massaro Dep. Tr. at 10.)  Volpe entered the

men's room with Massaro, Sacks and Volpe's PBA Representative, Officer Dean Losquadro,

whose presence had been requested by Volpe.  (Massaro Dep. Tr. at 10-11); (Ryder Dep. Tr. at

13.)  Volpe stood at a urinal and was directed to provide a urine sample in a sample cup.

(Massaro Dep. Tr. at 12.)  Massaro and Sacks were standing behind Volpe, and Losquadro was

standing by the bathroom sinks.  (Sacks Dep. Tr. at 11.)  Volpe was unable to produce a urine

sample during this first attempt.  (Sacks Dep. Tr. at 11); (Volpe Dep. Tr. at 12.)  Volpe was then

directed to return to the MAO to wait until he was able to urinate.  (Sacks Dep. Tr. at 11-12.)

While in the MAO, Volpe was given water, which he drank.  (Massaro Dep. Tr. at 17.)  They

waited approximately 45-60 minutes, and they (Volpe, Massaro, Sacks and Losquadro) then

returned to the men's room.  (Sacks Dep. Tr. at 12.)

During the second attempt to produce a urine sample, Volpe, Massaro, Sacks and

Losquadro were in the men's room.  (*Id.*)  That attempt was also unsuccessful.  (*Id.*)  During the

second attempt, Massaro heard what he believed to be the sound of Volpe coughing up phlegm and spitting into the sample cup.  (Massaro Dep. Tr. at 16.)  Massaro instructed Volpe to dispose of the cup; Volpe placed the cup in the general waste can.  (*Id*. at 14.)  Massaro observed that there was an unknown substance in that cup, and he retrieved the cup from the waste can.  (*Id*. at 15.)

Following the second attempt to produce a urine sample, Volpe was instructed to return to the MAO.  (*Id*. at 16.)  Believing that Volpe had engaged in an intentional effort to sabotage the test, two members of the Department's Internal Affairs Unit ("IAU"), Det. Sgt. Bellistri and Det. Sgt. Schuh, joined the others to witness Volpe's third attempt at providing a urine sample. (*Id*. at 17.)  Thus, Volpe's third attempt was witnessed by Massaro, Sacks, Losquadro and the two IAU officers, Bellistri and Schuh.  (Ryder Dep. Tr. at 12); (Massaro Dep. Tr. at 22.)  During the third attempt, in order to ensure the integrity of the collection of Volpe's urine sample, Massaro directed that Volpe could not stand facing the urinal, with his back to the witnesses, as he was permitted to do during the first two attempts.  (*Id*. at 21.)  Volpe was not otherwise told where to stand for the third attempt.  (*Id*.)

There is a window located at the east end of the second-floor men's room, facing Franklin Avenue.  (*Id*.)  The window features frosted glass and a bottom panel that opens inward into the room to a 45-degree angle, hinged from the bottom.[3]  (Massaro Dep. Tr. at 20.)  Massaro

---



[3] ECF No. 145-9 (Exhibit I).

stood with his back to the bathroom sinks, facing Volpe.  (*Id*. at 22); (Sacks Dep. Tr. at 15.)

Losquadro stood to Massaro's left, leaning against one of the bathroom sinks while Sacks,

Bellistri and Schuh stood between the stalls and the bathroom door.  (*Id*.)  It was approximately

9:00 p.m. and completely dark outside at the time of the third attempt, and the second-floor

window faced a grassy courtyard located between the headquarters building and Franklin

Avenue. (Volpe Dep. Tr. at 13, 15.)  On the third attempt, Volpe successfully produced a urine

sample.  (Massaro Dep. Tr. at 23.)  Volpe then left headquarters and drove himself home.

(Volpe Dep. Tr. at 20.)[4]


## PROCEDURAL HISTORY

Plaintiffs Volpe and the Police Benevolent Association ("PBA") originally filed the

Complaint in this Court on April 16, 2019 alleging violations of his substantive due process

rights, First Amendment right against retaliation, and Fourth Amendment right against unlawful

searches and seizures.  (ECF No. 1.)

Defendants then filed a motion for pre-motion conference seeking dismissal of the

original complaint for failure to state a claim and failure to plead a plausible *Monell*[5] claim,

followed by the filing of the motion itself.  (ECF Nos. 22, 33-38.)  Defendants' motion to

dismiss concerned all of Plaintiff's claims except the Fourth Amendment search and seizure

---

[4] Plaintiff only disputes four facts from Defendants' statement of undisputed material facts, namely (1) whether Plaintiff was told to throw away the sample cup in the biohazard bin or the regular waste bin; (2) whether Plaintiff was told to urinate in front of the window; (3) whether Defendants Sacks and Massaro were facing Plaintiff during the third attempt; and (4) whether Plaintiff could see out of the window. (ECF No. 150.)

[5] To successfully establish a *Monell* claim, a plaintiff must show that an action pursuant to a municipality's official policy caused the injury.  *White v. Cty. of Suffolk*, No. 20-CV-1501 (JS) (JMW), 2022 U.S. Dist. LEXIS 71684, at *8 (E.D.N.Y. Apr. 19, 2022) (citing *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 707 (1978)).

claim.  (ECF No. 33.)  The motion to dismiss was referred to Magistrate Judge Arlene R.
Lindsay for a report and recommendation ("R&R").  (Electronic Order dated May 27, 2020.)
Judge Lindsay recommended dismissal of (1) the PBA's First Amendment claim for lack of
standing; (2) Volpe's First Amendment retaliation claim for lack of protected speech; (3)
Volpe's Due Process claim because other constitutional amendments appropriately provided the
protection Volpe requested; and (4) Volpe's claim for punitive damages since municipalities are
immune from such damages.  (ECF No. 62.)  On November 30, 2020, District Judge Joan M.
Azrack adopted the R&R, granting Defendants' motion to dismiss in its entirety.  (ECF No. 70.)[6]

The parties then stipulated to Plaintiff's filing of an Amended Complaint, which was to
include only the Fourth Amendment claim.  (ECF No. 81.)  On March 2, 2021, Plaintiff filed his
Amended Complaint ("Complaint") (ECF No. 82) and Defendants filed their answer on March
19, 2021 (ECF No. 84.)

On May 25, 2021, the case was then reassigned to the undersigned.[7]  Discovery is
complete.  On October 5, 2022, Defendants filed a pre-motion letter for their intended motion for
summary judgment, which Judge Azrack granted.  (ECF No. 115; Electronic Order dated Nov.
14, 2022.)  The parties ultimately filed the motion for summary judgment, opposition, and reply
on August 31, 2023.  (ECF Nos. 144-151.)  The Court held Oral Argument on Defendants'
motion on September 26, 2023.[8]  After Oral Argument, parties were directed to file letter briefs

---

[6] The PBA chose not to replead its First Amendment retaliation claim, which was the only claim it had
remaining in this case.  Defendants then filed a motion to dismiss the PBA with prejudice (ECF No. 74),
which Judge Azrack granted.  (Electronic Order dated Jan. 21, 2021.)

[7] On January 31, 2023, the parties consented to the undersigned for all proceedings.  (ECF Nos. 130 and
131.)

[8] *See generally* Recording of Oral Argument at 11:07- 11:47, *Volpe et. al. v. Ryder et. al.*, No. 19-cv-
02236 (JMW) (E.D.N.Y. Sept. 26, 2023) (ECF No. 152) ("Oral Argument").

by October 6, 2023 addressing both (1) *Burka v. N.Y. City Transit Auth.*, 739 F. Supp. 814 (S.D.N.Y. 1990) and (2) *Picott v. Chatmon*, No. 12-cv-7202 (ER), 2017 U.S. Dist. LEXIS 151044 (S.D.N.Y. Sept. 15, 2017), which they did.  (*See* ECF Nos. 153 and 154.)

At bottom, Defendants argue that the compulsory production of urine under the circumstances presented does not constitute a search under the Fourth Amendment.  (ECF No. at 13-14.)  However, even if it did, the search was supported by reasonable suspicion and even probable cause since Plaintiff appeared to have been abusing drugs.  In addition, the manner in which the search was conducted was reasonable and justified when considering the employee's privacy interest, the intrusiveness of the search, and the government's interest in conducting the search.  (*Id.* at 14-19.)  And finally, Defendants argue that the "Collective Knowledge" and Qualified Immunity doctrines contribute to and govern over the reasonable suspicion leading to Defendant Ryder's conducting the test.  (*Id.* at 20-23.)

Plaintiff strenuously opposes, arguing that the compelled production of urine was indeed a search, that was done in violation of his Fourth Amendment Rights since he was an officer on medical leave and not working in a safety sensitive position. Plaintiff also states that Defendants cannot satisfy either reasonable suspicion or probable cause, regardless of what the standard is— a point of contention between the parties.  In addition, the Collective Knowledge doctrine should not apply since Defendants Massaro and Sacks have not substantiated the information provided via affidavit.  (ECF No. 149.)  Plaintiff does not address Defendants' qualified immunity argument.

## THE LEGAL FRAMEWORK

### A. Summary Judgment

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323, 325 (1986); *Gorbea v. Verizon N.Y., Inc.*, No. 20-3486, 2021 U.S. App. LEXIS 31272, at *2 (2d Cir. Oct. 19, 2021). Once the movant meets its initial burden, the nonmovant may defeat summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022). "The Court is to believe the evidence of the non-movant and draw all justifiable inferences in her favor, but the non-movant must still do more than merely assert conclusions that are unsupported by arguments or facts." *Sosa v. N.Y. City Dep't of Educ.*, 406 F. Supp. 3d 266, 268 (E.D.N.Y. 2019) (internal citations omitted). Critically important is recognizing that the role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely to undertake an analysis to identify whether any material issues of fact exist for trial. That is, the court's function is "issue-finding," not "issue-resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).

**B. The Fourth Amendment**

The Fourth Amendment prohibits unreasonable searches and seizures, U.S. Const.

amend. IV, and applies to state and municipal governments, *Skinner v. Ry. Lab. Execs. Ass'n*,

489 U.S. 602 (1989).  Because compelling urine from a public employee is a search under the

Fourth Amendment, it "must meet the reasonableness requirement of the Fourth Amendment."

*Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989).  Whether a search is

reasonable "depends on all of the circumstances surrounding the search or seizure and the nature

of the search or seizure itself."  *Skinner*, 489 U.S. at 619.  In the criminal setting, reasonableness

generally requires a judicial warrant supported by probable cause.  *Lynch v. City of N.Y.*, 737

F.3d 150, 157 (2d Cir. 2013).  "When the warrant requirement is excused, 'some quantum of

individualized suspicion' is preferred to find a search reasonable."  *Id*. (quoting *Maryland v.

King*, 569 U.S. 435, 447 (2013)).  "When a search or seizure is conducted without a warrant, the

government bears the burden of demonstrating that the search or seizure was reasonable."  *Hilton

v. State*, 961 So. 2d 284, 296 (Fla. 2007) (citing *United States v. Johnson*, 63 F.3d 242, 245 (3d

Cir. 1995)).

**C. Probable Cause versus Reasonable Suspicion**

The next question is, what quantum of suspicion applies to determine whether the

conducted search was reasonable: probable cause or reasonable suspicion?

"While the concepts of 'reasonable suspicion' and 'probable cause' are 'fluid' and not

susceptible of precise definition, 'the principal components of a determination of reasonable

suspicion or probable cause will be the events which occurred leading up to the stop or search,

and then the decision whether these historical facts . . . amount to reasonable suspicion or to

probable cause.'" *United States v. Lifshitz*, 369 F.3d 173, 188 (2d Cir. 2004) (citing *Ornelas v.

United States*, 517 U.S. 690, 696 (1996)).  "Suspicion, to be reasonable, therefore necessitates

11

not only a focus upon a particular person, but also concentration on a specific series of events."

*Id.*  In contrast to the reasonable suspicion standard, "[t]he probable-cause standard is peculiarly

related to criminal investigations."  *Von Raab*, 489 U.S. at 667 (citing *Colorado v. Bertine*, 479

U.S. 367, 371 (1987)).

In the instant case, the outcome of whether probable cause or reasonable suspicion

applies turns partially on Plaintiff's safety sensitive status.  The test for whether one is in a safety

sensitive position is whether the employees "discharge duties fraught with risks of injury to

others that even a momentary lapse of attention can have disastrous consequences."  *Knox Cnty.*

*Educ. Ass'n v. Knox Cnty. Bd. of Educ.*, 148 F.3d 361 (6th Cir. 1998) (citing *Skinner*, 489 U.S. at

628).  "Public employees working in safety sensitive jobs may be subject to compulsory drug

testing based upon a reasonable suspicion standard as opposed to the probable cause standard

applied to other warrantless searches."  *Perez v. Metro. Transp. Auth.*, 883 F. Supp. 2d 431

(S.D.N.Y. 2012).

The Court finds the *Picott v. Chatmon* case particularly instructive here. *Picott v.*

*Chatmon*, No. 12-cv-7202 (ER), 2017 U.S. Dist. LEXIS 151044 (S.D.N.Y. Sept. 15, 2017).

There, plaintiff, a police officer on disability leave from a line of duty injury, sued defendants

(Town of Clarkstown and individual defendants from the Town of Clarkstown Police

Department) claiming that he was subjected to blood and urine tests to reveal evidence of

criminal activity, which constituted illegal searches and seizures under the Fourth Amendment.

*Id.* at *30 n.2.  Specifically, defendants accused plaintiff of abusing pain medication and

threatened to terminate him if he did not attend drug rehabilitation.  *Id*. at *10.  They had also

ordered him to complete two blood and urine tests in an effort to terminate him for this alleged

drug addiction.  *Id*. at *10-11.  The court there analyzed Plaintiff's claim under the probable

cause standard.  The court stated that the police officer on disability leave was considered a non-safety sensitive employee at the time of the drug test.  *Id.* at *30 n.2.  When balancing the intrusion of Plaintiff's privacy interests with the legitimate governmental interests, the court found that Defendants had not stated whether a special need was present to justify the testing without probable cause nor did they mention how they met the probable cause standard to conduct the drug test.  *Id.* at *30.  Defendants' motion for summary judgment as to that claim was denied.

In an earlier case, *Burka v. N.Y. City Transit Auth.*, there were several classes of employees that were drug tested to determine if they were using marijuana and other drugs.  739 F. Supp. 814, 817 (S.D.N.Y. 1990).  These employees sued under the Fourth Amendment, challenging the drug testing policy.  *Id.*  The Court determined that there were three levels of reasonableness for searches under the Fourth Amendment: (1) Bare Reasonableness (safety sensitive employees); (2) Reasonable Suspicion (non-safety sensitive employees); and (3) Probable Cause (used in criminal contexts).  *Id.* at 827.  The Court analyzed both safety sensitive and non-safety sensitive employees finding that there are greater privacy interests involved with non-safety sensitive workers but work-related urine testing warrant a less significant privacy interest than those in a criminal setting.  *Id.* at 826.  In addition, it noted that the government's interest must be connected to "efficient operation in the workplace."  *Id.*  As for the intrusiveness prong of the reasonableness analysis, the court found that testing non-safety sensitive personnel could not even meet the bare reasonableness standard because there was no safety factor present and there was no notice that the test was going to be taken nor was the search conducted professionally.  *Id.* at 832.  Thus, the only way the non-safety sensitive drug testing could constitute a reasonable search under the reasonable suspicion standard was if it were done after

an incident, such as when an employee is involved in an accident or altercation or when an employee exhibits bizarre behavior.  *Id.* at 829.  The *Burka* court did not opine on testing for non-safety sensitive employees on sick leave.

### D. Reasonableness of the Search

Upon determining what quantum of suspicion applies to conduct the search, the Court must then engage in a context-specific analysis that balances the government's interests against an individual's privacy interests to determine whether the search itself was reasonable.  "[T]he test in a fourth amendment case is whether the search was reasonable. To determine reasonableness, the court must balance the intrusiveness of the search on the individual's fourth amendment interests against its promotion of legitimate governmental interests." *Sec. & L. Enf't Emps.*, 737 F.2d 187, 201 (2d Cir. 1984).

It is against this backdrop that the Court considers Defendants' motion for summary judgment.

## <u>DISCUSSION</u>

### A. Whether the Drug Test Violates the Fourth Amendment

Defendants contend that the urine test at issue does not constitute a search under the Fourth Amendment and therefore does not apply to the facts here.  However, contrary to Defendants' assertion, there are a legion of cases that hold that compulsory urine samples can and *do* constitute "searches" under the Fourth Amendment considering the intrusions on one's expectation of privacy.  These searches would be subject to a reasonableness analysis. *Coppinger v. Metro-North Commuter R.R.*, 861 F.2d 33, 35 (2d Cir. 1988). ("[C]ompulsory urinalysis of public employees qualifies as a 'search and seizure' within the meaning of the Fourth Amendment."); *Storms v. Coughlin*, 600 F. Supp. 1214, 1217 (S.D.N.Y. 1984) (noting that parties agreed that a urinalysis constituted a Fourth Amendment search); *Skinner*, 489 U.S.

at 602 ("Because it is clear that the collection and testing of urine intrudes upon expectations of privacy that society has long recognized as reasonable, the Federal Courts of Appeals have concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment."); *Watson v. Sexton,* 755 F. Supp. 583, 588 (S.D.N.Y. 1991) ("The Fourth Amendment's prohibition against unreasonable searches and seizures applies to DOS's employee substance abuse regulations requiring urine testing. The department's urinalysis policy therefore must meet the reasonableness requirement of the Fourth Amendment."); *Spencer v. N.Y. City Transit Auth.*, No. 95-CV-4779 (JG), 1999 U.S. Dist. LEXIS 408, at *22-23 (E.D.N.Y. Jan. 14, 1999) ("The testing of urine for drugs constitutes a search and, therefore, must meet the reasonableness requirement of the Fourth Amendment.") (citing *Von Raab*, 489 U.S. at 665); *Drake v. Lab. Corp. of Am. Holdings*, 290 F. Supp. 2d 352, 359 (E.D.N.Y. 2003) (noting that if the government requires employees to produce urine samples then that analysis is a search subject to the Fourth Amendment's reasonableness requirement).

Defendants rely on *Fowler v. N.Y. City Dep't of Sanitation*, 704 F. Supp. 1264 (S.D.N.Y. 1989) for the proposition that the urinalysis is *not* a search under the Fourth Amendment because urine is simply a waste product turned over to the public sewage system. (ECF No 151 at 11.) However, *Fowler* concerned a compulsory *pre-employment* urine test in which the plaintiff's first sample came back positive, so the Department of Sanitation personnel tested him a second time which was permitted by their policy. *Fowler*, 704 F. Supp. at 1266. This second test came back negative, and plaintiff was hired thereafter. *Id.* at 1267. Throughout his probationary period of employment with defendant, he was required to undergo "follow-up tests" as a result of his contradictory tests during the pre-employment stage. *Id.* He tested positive for two subsequent tests and was subsequently fired. *Id.* The court there noted there was no Fourth

Amendment violation because whether a drug test constitutes a search depends on the "concrete facts" looking specifically to the person's expectation of privacy and the government's interest in ascertaining employees' fitness for employment.  *Id.* at 1270.

The facts in *Fowler* are inapposite to those presented here.  Here, Plaintiff was not in a pre-employment or a probationary period with the NCPD, but rather was on sick leave and had been employed with the force since 2004.  (ECF No. 82 ¶ 50.)  In addition, there had not been previous positive tests giving rise to Defendants' testing of Plaintiff in this instance.  Instead, there was information providing support for the drug test at issue which allowed them to test him per NCPD's policy.

Having found that the drug test is a search under the Fourth Amendment, the Court next considers the standard for determining whether there was enough to conduct the search.

## B. Whether Probable Cause or Reasonable Suspicion Applies

Plaintiff and Defendants sharply dispute whether Plaintiff was in a safety-sensitive position at the time of the search.  Even if Plaintiff was not in a safety-sensitive position, the government may still possess an interest in testing employees in non-safety sensitive positions.  To be sure, the calculus changes, but a determination that Plaintiff was not in a safety-sensitive position does not end the inquiry.

Defendants argue that even if the test did constitute a search, Plaintiff was in a safety sensitive position which subjected him to a drug test based solely on reasonable suspicion—an admittedly less stringent standard than probable cause.  (ECF No. 148 at 14-15.)  Plaintiff, on the other hand, asserts that he was not in a safety sensitive position at the time of the drug test.  (ECF No. 153).  Rather, he was on sick leave and did not possess a firearm, making the test

16

unreasonable and a violation of his constitutional rights.[9]  (ECF No. 149 at 6, 10.)  In his supplemental brief, Plaintiff argues that probable cause applies (not reasonable suspicion) and compares the case at bar to *Picott*.  Further, he argues there is no special need to justify the testing due his non-safety sensitive status, as he did not pose a danger or threat to other officers or the public.  (ECF No. 153.) Plaintiff next turns to *Burka*, arguing that the reasonable suspicion standard fails here because Defendants failed to follow protocol.  (*Id.*)

Defendants, however, argue that *Burka* is comparable in this case because there, the court applied the reasonable suspicion standard, which Defendants argue has been met here.  They go on to state that the court recognized that there are many safety-sensitive jobs that do not involve the use or carrying of a gun and the police department has a critical interest in ensuring officers are not abusing drugs, regardless of whether they are armed.  (ECF No. 154.)  Thus, they argue that Plaintiff has not shed his safety-sensitive status simply because he is on medical leave— rather he is still subject to the reasonable suspicion standard because of his status as a police officer.  (*Id.*)  Nevertheless, they argue that they have met the probable cause—more stringent— standard because of the surgeon's account that he had been taking an excessive amount of medications.  (*Id.*)

Finally, Defendants also argue that *Picott* is inapposite because there the court did not consider the levels of proof allowing the urine testing of public employees—in other words, he

---

[9] Defendants cite to *Perez* for the proposition that a reasonable suspicion standard, and not a probable cause standard, applies to the drug test at issue here.  (ECF No. 148 at 14.)  However, Plaintiff argues that there are several distinguishing facts.  (ECF No. 149 at 8.)  Here and unlike *Perez*, Plaintiff was on sick leave at the time of the drug test and did not return to work to continue his regular duties.  In addition, there is no MOU in this case or any other similar communication from NCPD to Plaintiff indicating that sick leave personnel will be exempt from the normal drug testing procedure.  Indeed, it appears as though the Commissioner's Procedural Order was to govern all employees, regardless of whether an officer was on sick leave.  (ECF No. 151 at 10.)  Thus, had there been such an MOU in place as in *Perez*, Plaintiff would not have been subjected to the drug test at issue since he was on sick leave since the date of his injury.

did not distinguish between probable cause, reasonable suspicion, or bare reasonableness, as the court did in *Burka*.

Regarding Plaintiff's status, the Court finds that under the circumstances presented, Plaintiff here was *not* in a safety sensitive position.  He was on sick leave, confined to his home, and did not bear a firearm throughout the time leading up to the administered drug test.  *See Picott v. Chatmon*, No. 12-cv-7202 (ER), 2017 U.S. Dist. LEXIS 151044, at *30 n.2 (S.D.N.Y. Sept. 15, 2017) (noting that plaintiff-officer in a non-safety sensitive position since he was on disability leave at the time of the drug test but applying a probable cause standard to determine whether criminal activity was present).  That notwithstanding, a reasonable suspicion standard applies for the reasons below.

Despite Plaintiff's urging to apply the probable cause standard, a reasonable suspicion standard applies.  *First*, unlike *Picott*, there is no criminality at issue here to warrant applicability of the higher probable cause standard.  Both *Picott* and *Burka* noted that probable cause applies in the criminal context.  *See Picott*, 2017 U.S. Dist. LEXIS 151044, at *28 (applying probable cause where plaintiff was tested to detect criminal activity); *see also Burka*, 739 F. Supp. at 828 ("The probable cause standard 'is peculiarly related to criminal investigations….'"). In the present case, Defendants sought to test Plaintiff for the presence of drugs after having received several pieces of information that he had been abusing prescription medications. This was not done as part of a criminal investigation, but rather done in the employment context.

*Second*, the Commissioner's Procedural Order, by definition, states that members of NCPD can be tested based on "reasonable suspicion of drug abuse." (Commissioner's Procedural Order at 4.)  Indeed, at Oral Argument, Plaintiff's counsel initially conceded that reasonable suspicion applies, not probable cause, to determine the reasonableness of the search.  *See* Oral

18

Argument at 11:13; 11:20 (admitting that the standard that applies is reasonable suspicion "by virtue of this [Commissioner's Procedural] Order"). However, at later points during Oral Argument and even in Plaintiff's supplemental briefing to the Court, Plaintiff recanted and argued the probable cause standard applies instead. *Id.* at 11:15 (Q: "Are you retracting your concession that it's reasonable suspicion? A: "Now I am."); (ECF No. 153 at 2) ("The plaintiff herein, respectfully submits that it is the *Picott* case [probable cause] that should be applied in this matter and that the *Burka* standard [reasonable suspicion] should not."). Nonetheless, it is clear to the Court that reasonable suspicion applies given the lack of criminality and the standard set forth in the Commissioner's Procedural Order. This is also consistent with the reasoning of *Burka*.

So how is "reasonable suspicion" determined? Well, reasonable suspicion "requires more than a hunch" and "is satisfied as long as authorities can point to specific and articulable facts which, taken together with rational inference from those facts, provide a particularized and objective basis for suspecting legal wrongdoing." *United States v. Hamilton*, 2022 U.S. Dist. LEXIS 71876, at *10 (S.D.N.Y. Apr. 19, 2022); *see also United States v. Arenas*, 37 F. Supp. 2d 322, 326 (S.D.N.Y. 1999) (noting that the reasonable suspicion standard is "rather lenient" and that officers must have "specific articulable facts" that "reasonably warrant suspicion"). A consideration of several different factors arise when determining whether a search can be upheld under the reasonable suspicion standard: "(1) nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." *Russo v. City of Hartford*, 341 F. Supp. 2d 85, 100 (D. Conn. 2004) (citing *Sec. & Law Enf't Emps., Dist. Council 82 v. Carey*, 737 F.2d 187, 205 (2d Cir. 1984)).

According to the Commissioner's Procedural Order, distributed to all members, there must first be reasonable suspicion before obtaining approval for a drug screening test. (Commissioner's Procedural Order at 4.)  The Commissioner's Procedural Order states that the NCPD can test a member of the Force if there are "specific articulatable facts *which may include, but are not limited to:* reports and observations of the member's drug related activities."  (*Id.* at 3) (emphasis added).  This is a non-exclusive list of examples.

Here, there is enough evidence to constitute reasonable suspicion for administering the drug test because of the observations of Plaintiff's drug activity from various sources.  After hearing evidence about Plaintiff's use of his hand, his disposition at the benefits hearing, and his appointment with the Department Surgeon, Commissioner Ryder authorized that the drug test go forward.[10]  (Ryder Dep. Tr. at 6-7.)  And of note here is that Plaintiff has not disputed the facts leading up to the search in his 56.1 statement but rather only challenges the manner in which the search itself was performed.  (ECF No. 150.) This equipped Defendants with adequate information to compel Plaintiff to take the test.

Further, the Commissioner's Procedural Order applies to *all* members of the Force, whether on leave or not, there is no distinction made.  This was undisputed at Oral Argument. (*See* Oral Argument at 11:36-11:37) (noting that the Commissioner's Procedural Order is a negotiated procedure that does not distinguish between sick and on-duty officers).  Plaintiff was

---

[10] The undersigned also notes that although the information came from other sources, namely the Department Surgeon and the officer moderating the benefits hearing, it need not be admissible evidence. *See Clark v. Sikorski*, No. 16-cv-7744 (PKC), 2020 U.S. Dist. LEXIS 14998, at *12 n.3 (S.D.N.Y. Jan. 29, 2020) (noting that warrantless arrests can be based on hearsay if the informant's statements are "reasonably corroborated") (citing *Illinois v. Gates,* 462 U.S. 213, 241-42 (1983)); *Freeman v. Adams*, No. 12-CV-86 (SNLJ), 2014 U.S. Dist. LEXIS 36000 at *9 (E.D. Mo. Mar. 19, 2014) (noting that both reasonable suspicion and probable cause can "be based on hearsay information").  Plaintiff's counsel also conceded that the information gathered to support the reasonable suspicion necessary to perform the drug test can be based on hearsay.  (*See* Oral Argument at 11:40-11:41.)

not exempt from reasonable suspicion testing, which does not limit the member's questionable behavior to on-the-job impairment. He was still a member of the Force, despite his being on sick leave, and therefore subject to the Order. For these reasons, the Court finds that reasonable suspicion was present to conduct the test.

### C. Whether The Drug Test Was Performed in a Reasonable Manner

Having concluded that Defendants had reasonable suspicion to conduct the test, the Court now considers the reasonableness of the search. To do so, the Court must balance an individual's Fourth Amendment interests with the legitimate interests of the government. *Illinois v. Lafayette,* 464 U.S. 640, 644 (1983); *see also United States v. Lifshitz*, 369 F.3d 173, 186 (2d Cir. 2004) (noting that the search must be minimally intrusive but maximally effectiveness so the searches "bear a close and substantial relationship to the government's special needs"); *Allen v. Schiff*, 908 F. Supp. 2d 451, 460 (S.D.N.Y. 2012) (weighing (1) the employee's privacy interests; (2) the intrusiveness of the search; and (3) the government's interest in completing the search to determine the reasonableness of the search). For the reasons that follow, the Court finds the conduct of the search reasonable under the circumstances.

#### i. Government Interest

Defendants argue that there is a compelling government interest to ensure that those who carry firearms are not drug users and are unimpaired at all times to protect the public. (ECF No. 148 at 18-19.) Plaintiff responds again reiterating his sick duty status and lack of firearm, particularly noting that he would have "posed no threat to the public's safety." (ECF No. 149 at 10.)

The government's interest must be "important enough to justify the particular search" despite the fact that the search may be intrusive and the plaintiff's expectation of privacy diminished. *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 661 (1995); *see also Allen*, 908 F. Supp.

2d at 462 (noting that the government must articulate at least some justification for a highly intrusive search).

The government has a strong interest in monitoring the drug use of employees, including employees that will eventually be returning to work and retrieving their firearm.  Indeed, the Commissioner's Procedural Order lays out its purpose for conducting these employee drug tests: "to ensure both the continued well-being of [NCPD's] members and the professional reputation [it has] earned," and "formalize a Department policy which does not condone the abuse of any substance capable of impairing the ability of employees to perform their duties." (Commissioner's Procedural Order at 2); *Burka*, 739 F. Supp. at 826 (finding no special need to search non-safety sensitive employees, but there was still a legitimacy of the transit authority's interest in disciplining employees in those jobs who engaged in unlawful drug use before or at work).  Because Defendants conducted its urine testing for work-related purposes and not in a blanket fashion—but rather testing "for cause"—the Court here finds that they had a sufficient interest in doing so.

There is also a strong nexus to the NCPD's purpose and the facts here, namely, because he was seen using his injured hand on several occasions though he complained he could not use it (Ryder Dep. Tr. at 10; Sacks Dep Tr. at 6); he was sweating profusely and had sunken eyes at his benefits hearing before other officers (Ryder Dep. Tr. at 10); and a surgeon relayed to Commissioner Ryder that Plaintiff was taking an excessive amount of pills for his hand.  (Ryder Dep. Tr. at 10-11; Sacks Dep. Tr. at 8.)  Thus, the drug test was performed to ensure Plaintiff's "continued well-being" and present tarnishing of the NCPD's "professional reputation [it has] earned."  (Commissioner's Procedural Order at 2.); *see Burka v. N.Y. City Transit Auth.*, 739 F. Supp. 814 (S.D.N.Y. 1990) (finding that non-safety sensitive drug testing *could* constitute a

22

reasonable search under the reasonable suspicion standard if done after an incident, such as when an employee exhibits bizarre behavior).

For the reasons stated, there is no genuine issue of material fact concerning the government's interest in performing the test.

    ii.    **Privacy Interest**

Defendants assert that Plaintiff had a diminished privacy expectation because he was in a public safety function and was on notice of the possibility of getting drug tested.  (ECF No. 148 at 16.)  Plaintiff, in turn, argues that he should have been afforded a "heightened right to privacy" given his alleged status as a non-safety sensitive officer on sick leave and lack of a firearm. (ECF No. 149 at 10.)

The Fourth Amendment protects legitimate expectations of privacy but depends on the facts and circumstances of the employee's job.  *See Allen*, 908 F. Supp. 2d at 460 (noting that a corrections officer-plaintiff who carried a firearm and was subjected to random drug testing had a diminished expectation of privacy); *see also Connelly v. Newman*, 753 F. Supp. 293, 299 (N.D. Cal. 1990) (discussing that individual suspicion diminishes employees' expectations of privacy and that employees who used drugs while off-duty were on notice that they were subject to reasonable suspicion testing); *Am. Fed'n of Gov't Emps., Loc. 1533 v. Cheney*, 754 F. Supp. 1409, 1427 (N.D. Cal. 1990) (noting that the "requirement of individualized suspicion based on objective observable criteria naturally diminishes the privacy expectation of employees").

Here, Plaintiff's privacy expectation was reduced by virtue of the fact that the testing was conducted under the reasonable suspicion, not the random testing standard.  *See Am. Fed'n of Gov't Emps., AFL-CIO, Loc. 2391 v. Martin*, 969 F.2d 788, 793 (9th Cir. 1992) (stating that reasonable suspicion drug testing was not random or unannounced); *Transp. Inst. v. United*

*States Coast Guard*, 727 F. Supp. 648, 656 (D.D.C. 1989) ("[R]andom testing is more intrusive on the individual's privacy interests than with any other category of testing.").

Plaintiff was on notice by virtue of the Commissioner's Procedural Order that he may get drug tested. (Volpe Dep. Tr. at 17) (Q: "Are you aware that the Department has procedures for conducting drug tests of officers or applicant?" A: "Yes."). The Commissioner's Procedural Order clearly sets out the standard needed to drug test an employee of the NCPD as well as the procedures in how the drug test should be conducted. (Commissioner's Procedural Order at 3-4, 7-8.) In fact, at his deposition, Plaintiff himself admitted that he was aware of the NCPD's procedures for conducting drug tests on officers, as he had been tested plenty of time before. (Volpe Dep. Tr. at 17) ("I've been drug tested over my 20-year career, you know, numerous times."). Further and as explained above, there is nothing in the Commissioner's Procedural Order stating that employees on leave cannot be drug tested—the Commissioner's Procedural Order is the operative drug testing procedure for *all* NCPD employees.

For these reasons, the Court finds that that Plaintiff enjoyed a diminished expectation of privacy.

   iii.   **Intrusiveness**

The parties dispute the degree of intrusiveness of the search. Defendants state that they had reasons to justify its direct observation of the drug test because of the potential tampering of the sample (ECF No. 148 at 17-18); however, Plaintiff states that there was no reason to believe that Plaintiff tampered with the sample and calls into question Defendant Massaro's conduct during the drug testing process. (ECF No. 149 at 11.) Further, in Losquadro's deposition, Losquadro states that after being accused of spitting into the sample cup, Plaintiff emphatically said he did not do so. (ECF No. 149-1 at 69.)

To determine whether the procedure employed to undertake a urine test violates the Fourth Amendment, courts have looked to the "the manner in which production of the urine sample is monitored." *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646, 658 (1995).  Typically, "[t]he collecting of samples of urinalysis intrudes upon an excretory function traditionally shielded by great privacy." *Perez v. Metro Transp. Auth.,* No. 11-cv-8655 (RWS), 2012 U.S. Dist. LEXIS 74123, at *20 (S.D.N.Y. 2012).  The Second Circuit has cautioned that a search program "must seek a minimum of intrusiveness coupled with maximal effectiveness." *United States v. Lifshitz*, 369 F.3d 173, 186 (2d Cir. 2004).

The Commissioner's Procedural Order states that "[t]he integrity of the collection process will be maintained with the utmost consideration of the privacy of the person being tested.  Only a person of the *same sex* as the person being tested, shall be present during collection.  The Superior Officer monitoring the test will observe the collection of the sample."  (Commissioner's Procedural Order at 8) (emphasis added).

Here, it is undisputed that several officers observed Plaintiff produce the urine sample. During the first two attempts, Plaintiff was afforded privacy when trying to produce a urine sample.  However, it was only after Plaintiff's possible tampering (Plaintiff's potential spitting in the cup) with the sample and finding a foreign substance in the discarded cup that Defendants brought in the additional officers from Internal Affairs to observe.  *See Vernonia*, 515 U.S. at 658 (noting that the monitors were present to "listen for normal sounds of urination" though they did not directly observe the student athletes).  Further, all observers were of the same sex which supports the notion that the search was not intrusive and was in accordance with the governing policy. (Commissioner's Procedural Order at 8); *see also Allen*, 908 F. Supp. 2d at 461-62 (citing other circuit cases in which "direct observation" for urine tests was implemented to prevent

25

tampering of the urine specimen).  And, Massaro appeared to be the only officer facing the

Plaintiff during the collection of his sample.  (Sacks Dep. Tr. at 15.) (discussing that, during the

third attempt, Massaro faced Volpe and Sacks, Bellistri and Schuh stood between the stalls and

bathroom door).  Thus, because there was a reason to suspect that the specimen's integrity was

compromised, namely because Plaintiff allegedly spat in the sample cup, the other male officers

were correctly in the bathroom at the time of the drug test.[11]

This means that whether Plaintiff *actually did* spit in the sample cup is irrelevant—

Defendants had an articulable reason to directly observe him thereafter and these cases illustrate

that preventative measures can be taken to avoid such interferences.  Thus, the direct observation

of the sample was justified in light of the potential tampering.

### D.  Whether the Collective Knowledge Doctrine Applies

Under the collective knowledge doctrine, when multiple officers are involved in an

investigation, the knowledge of one officer is "shared by all."  *Savino v. City of N.Y.*, 331 F.3d

63, 74 (2d Cir. 2003); *United States v. Hussain*, 835 F.3d 307, 316 n.8 (2d Cir. 2016) (noting that

an officer's knowledge is imputed to another even if the officer conducting the search "does not

possess all the relevant facts" and that officers can "act on the strength" of his fellow officers'

work); *United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) (noting that searches are

allowed if the searching officer does not have the specific information to form the reasonable

suspicion required but possesses sufficient information to justify the search known by other

---

[11] In his deposition and implicitly mentioned throughout his opposition, Plaintiff states that he was
directed to face an open window when producing his urine sample.  (ECF No. 149 at 5, 7.)  However,
when Defendant Massaro was asked in his deposition whether Plaintiff was told to face the window,
Massaro responded "absolutely not." (Massaro Dep. Tr. at 21.)  Further, Massaro described the window
as having "frosted glass" and Volpe said that the test occurred around 9:00 pm.  (Massaro Dep. Tr. at 20;
Volpe Dep. Tr. at 13.)  Thus, even if he had been facing the window, there would not have been an
unreasonable degree of intrusion when considering the condition of the window and the time the sample
was taken.

officials involved in the matter).  This doctrine is not applied, however, if the officers have not

communicated suspicions to one another before conducting the search.  *Hussain*, 835 F.3d at 316

n.8.

Defendants argue that this doctrine applies because Defendants Massaro and Sacks

received information which was imputed on to the NCPD thus allowing Defendants to

reasonably infer that Plaintiff was abusing drugs.  (ECF No. 148 at 20-21.)  Plaintiff, however,

argues that the information about his taking more than the necessary amount of pain killers for

his hand is not based on his level of pain but was based on a "brief examination" of his hand on a

monthly basis.  (ECF No. 149 at 11.)  Further, he contends that Defendant Ryder only stumbled

upon this information "third hand"—namely there is no way to know what or how the

information was conveyed to Ryder from Massaro.  (*Id.*)  Finally, he states that Defendants

should have provided an Affidavit from the Department Surgeon or Chief Surgeon who relayed

information about his alleged drug abuse since.  (*Id.* at 12.)

Although there is enough here to substantiate Defendants' administration of the drug test

under the reasonable suspicion standard, it is of note that the collective knowledge doctrine

allowed Defendants to proceed with the drug test based on their fellow officers' collective

evidence to which Defendants may not otherwise be privy.  It is undisputed that the information

was not received *directly* from Defendants Ryder, Massaro and Sacks but rather these tips were

relayed from the Department Surgeon and Chief Walsh who was present at Plaintiff's benefits

hearing.  However, the very essence of the collective knowledge doctrine is to rely on other

officers' information.  *See Hussain*, 835 F.3d at 316 n.8 (finding that reasonable suspicion can be

based on the imparting officer's knowledge and not on whether the officer relying on the

information was aware of the facts).  Defendants received reliable information from other

officers on not just one occasion, but on multiple, separate occasions regarding his alleged abuse

of drugs.  Accordingly, the Court finds no genuine issue of material fact and finds the collective

knowledge doctrine applies.[12]

## **CONCLUSION**

For the reasons stated herein, Defendants' Motion for Summary Judgment is

**GRANTED**.   The Clerk of the Court is directed to enter judgment accordingly and dismiss the

case.

Dated: Central Islip, New York
          November 2, 2023


                                                      S O   O R D E R E D :

                                                      /S/ *James M. Wicks*
                                                      JAMES M. WICKS
                                                      United States Magistrate Judge

---

[12] Defendants make a final argument that they are protected by the doctrine of qualified immunity, which Plaintiff did not address.  In light of the disposition above, the Court need not address qualified immunity.