UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

CHARLES VOLPE *et. al.*,

        Plaintiffs,

-against-

PATRICK RYDER *et. al.*,

        Defendants.
------------------------------------------------------------------X

**MEMORANDUM AND ORDER**
19-cv-02236 (JMW)

**A P P E A R A N C E S:**

Peter E. Brill, Esq.
**Brill Legal Group, P.C.**
64 Hilton Ave
Hempstead, NY 11550
*Attorney for Plaintiff*

Scott M. Karson, Esq.
**Lamb & Barnosky, LLP**
534 Broadhollow Road
Melville, NY 11747
*Attorney for Defendants Ryder Sacks, Massaro, and County of Nassau*

**WICKS,** Magistrate Judge:

      This case stems from Plaintiff Charles Volpe's Fourth Amendment claim against Defendants Patrick Ryder, Commissioner of the Nassau County Police Department; Russell Sacks, Sergeant in the Nassau County Police Department; Joseph Massaro, Lieutenant in the Nassau County Police Department ("NCPD"); and the County of Nassau.  He specifically alleged that Defendants unlawfully subjected him to a drug test while he was on sick leave from a line-of-duty injury.  This Court previously granted Defendants' motion for summary judgment to dismiss the Amended Complaint (ECF No. 155).  However, now before the Court is Plaintiff's

1

motion for reconsideration of the order granting Defendants' summary judgment motion (ECF No. 161), which Defendants oppose (ECF No. 163).  For the reasons that follow, Plaintiff's motion for reconsideration is **DENIED**.

## FACTUAL BACKGROUND

A brief review of the factual background is necessary in the context of the instant motion.

On December 11, 2018, Plaintiff Volpe was administered a drug test at the NCPD headquarters in Mineola.  (ECF No. 82 ¶ 59.)  The test was administered at the authority of Commissioner Ryder, pursuant to Commissioner's Procedural Order 8-95, which authorizes testing of NCPD members for cause upon reasonable suspicion of drug abuse.  (ECF No. 145-5 at 6-11) ("Ryder Dep. Tr."); (ECF No. 145-10 at 4) ("Commissioner's Procedural Order").  The Commissioner's Procedural Order 8-95 defines Drug Abuse as follows:

> **Drug Abuse** - The term "Drug Abuse" shall include the use of a controlled substance or marihuana, which has not been legally prescribed and/or dispensed, and the improper or excessive use of a legally prescribed drug.

(*Id.* at 2.)  The Commissioner's Procedural Order 8-95 defines "Reasonable Suspicion" as follows:

> **Reasonable Suspicion** - Reasonable Suspicion that a member is abusing drugs exists when objective facts and observations are brought to the attention of a Superior Officer and based upon the reliability and weight of such information he/she can reasonably infer or suspect that a member of the Department is abusing drugs. Reasonable Suspicion must be supported by specific articulatable facts which may include, but are not limited to: reports and observations of the member's drug related activities, i.e., purchase, sale or possession of drugs, associations with known drug dealers or users, observations of the member at known drug related locations, etc.; an otherwise unexplained change in the member's behavior or work performance; and observed impairment of the member's ability to perform his duties.

(*Id.* at 3.)[1]

---

[1] The Commissioner's Procedural Order does not discuss whether these testing procedures apply to non-safety sensitive personnel, or off-duty officers or those on sick leave.

Prior to authorizing the administration of the test, Commissioner Ryder was advised that Plaintiff suffered a line of duty injury to his right hand on October 4, 2016, and remained on sick leave due to that injury for more than two years, until after the December 11, 2018 drug test, and during that time, Volpe was taking hydrocodone, a prescription pain killer, on a daily basis. (ECF No. 145-6 at 5-8) ("Volpe Dep. Tr."). Commissioner Ryder was advised that Volpe told a Department Surgeon that he was unable to move his right hand, but Volpe was seen the same day using his right hand. (Ryder Dep. Tr. at 10.) In addition, subsequent to the date of Volpe's right-hand injury, but prior to the date of administration of the drug test, Volpe was observed using his right hand to: put up Christmas decorations at his home; install a child's car seat in his car; drag garbage cans between his house and the street; and operate his mobile phone. (ECF No. 145-7 at 6) ("Sacks Dep. Tr."). Ryder was also advised that at a hearing on Volpe's application for benefits, Volpe was observed by the hearing officer, Deputy Chief Ronald Walsh, to be sweating "profusely," and his eyes appeared to be "sunken," causing the hearing officer to suspend the hearing and report to Commissioner Ryder that the hearing could not continue because "something's wrong" with Volpe. (Ryder Dep. Tr. at 10.) Volpe testified at the hearing that, since the date of his hand injury, he had been taking Vicodin four times per day and Percocet once daily. (ECF No. 145-11 at 4-7.) ("Transcript of Benefits Hearing"). A Department Surgeon reported to Commissioner Ryder that the amount of pain medication being taken by Volpe exceeded that which was necessary and appropriate for an injury of the severity and duration of Volpe's hand injury. (Ryder Dep. Tr. at 10-11); (Sacks Dep. Tr. at 8.)

On December 11, 2018, Deputy Inspector Massaro was the Commanding Officer of the NCPD Medical Administration Office ("MAO"). (ECF No. 145-8 at 5) ("Massaro Dep. Tr."). Det. Sgt. Sacks was the Deputy Commanding Officer of the MAO. (Sacks Dep. Tr. at 18.)

3

Massaro and Sacks drove from NCPD Headquarters to Volpe's home to order him to return to NCPD headquarters for administration of a drug test for cause based on reasonable suspicion that Volpe was abusing prescription medication. (Sacks Dep. Tr. at 9); (Massaro Dep. Tr. at 8.)

Upon Volpe's arrival at NCPD headquarters, he was directed to the MAO and then to the men's room located on the second floor of the building, across the hall from the MAO and the Chief Surgeon's office. (Sacks Dep. Tr. at 10); (Massaro Dep. Tr. at 10.) Volpe entered the men's room with Massaro, Sacks and Volpe's PBA Representative, Officer Dean Losquadro, whose presence had been requested by Volpe. (Massaro Dep. Tr. at 10-11); (Ryder Dep. Tr. at 13.) Volpe stood at a urinal and was directed to provide a urine sample in a sample cup. (Massaro Dep. Tr. at 12.) Massaro and Sacks were standing behind Volpe, and Losquadro was standing by the bathroom sinks. (Sacks Dep. Tr. at 11.) Volpe was unable to produce a urine sample during this first attempt. (Sacks Dep. Tr. at 11); (Volpe Dep. Tr. at 12.) Volpe was then directed to return to the MAO to wait until he was able to urinate. (Sacks Dep. Tr. at 11-12.) While in the MAO, Volpe was given water, which he drank. (Massaro Dep. Tr. at 17.) They waited approximately 45-60 minutes, and they (Volpe, Massaro, Sacks and Losquadro) then returned to the men's room. (Sacks Dep. Tr. at 12.)

During the second attempt to produce a urine sample, Volpe, Massaro, Sacks and Losquadro were in the men's room. (*Id*.) That attempt was also unsuccessful. (*Id*.) During the second attempt, Massaro heard what he believed to be the sound of Volpe coughing up phlegm and spitting into the sample cup. (Massaro Dep. Tr. at 16.) Massaro instructed Volpe to dispose of the cup; Volpe placed the cup in the general waste can. (*Id*. at 14.) Massaro observed that there was an unknown substance in that cup, and he retrieved the cup from the waste can. (*Id*. at 15.)

Following the second attempt to produce a urine sample, Volpe was instructed to return to the MAO.  (*Id*. at 16.)  Believing that Volpe had engaged in an intentional effort to sabotage the test, two members of the Department's Internal Affairs Unit ("IAU"), Det. Sgt. Bellistri and Det. Sgt. Schuh, joined the others to witness Volpe's third attempt at providing a urine sample.  (*Id*. at 17.)  Thus, Volpe's third attempt was witnessed by Massaro, Sacks, Losquadro and the two IAU officers, Bellistri and Schuh.  (Ryder Dep. Tr. at 12); (Massaro Dep. Tr. at 22.)  During the third attempt, in order to ensure the integrity of the collection of Volpe's urine sample, Massaro directed that Volpe could not stand facing the urinal, with his back to the witnesses, as he was permitted to do during the first two attempts.  (*Id*. at 21.)  Volpe was not otherwise told where to stand for the third attempt.  (*Id*.)

It was approximately 9:00 p.m. and completely dark outside at the time of the third attempt. (Volpe Dep. Tr. at 13, 15.)  On this attempt, Volpe successfully produced a urine sample.  (Massaro Dep. Tr. at 23.)  He then left headquarters and drove himself home.  (Volpe Dep. Tr. at 20.)[2]

## PROCEDURAL HISTORY

Following the Hon. Joan M. Azrack's adoption of the Hon. Arlene R. Lindsay's Report and Recommendation concerning Defendants' motion to dismiss (ECF No. 70), Plaintiff filed his Amended Complaint ("Complaint") (ECF No. 82), which only included the Fourth Amendment claim, and Defendants filed their answer on March 19, 2021.  (ECF No. 84.)  On January 31, 2023, the parties consented to the undersigned for all proceedings.  (ECF Nos. 130 and 131.)

---

[2] Plaintiff only disputes four facts from Defendants' statement of undisputed material facts, namely (1) whether Plaintiff was told to throw away the sample cup in the biohazard bin or the regular waste bin; (2) whether Plaintiff was told to urinate in front of the window in the bathroom; (3) whether Defendants Sacks and Massaro were facing Plaintiff during the third attempt; and (4) whether Plaintiff could see out of the bathroom window.  (ECF No. 150.)

5

The parties bundle filed Defendants' motion for summary judgment, opposition, and reply on August 31, 2023.  (ECF Nos. 144-151.)

The Court held Oral Argument on Defendants' motion on September 26, 2023[3] and had the parties submit supplemental briefs addressing both (1) *Burka v. N.Y. City Transit Auth.*, 739 F. Supp. 814 (S.D.N.Y. 1990) and (2) *Picott v. Chatmon*, No. 12-cv-7202 (ER), 2017 U.S. Dist. LEXIS 151044 (S.D.N.Y. Sept. 15, 2017), which they did (*see* ECF Nos. 153 and 154).

On November 2, 2023, the Court granted Defendants' motion for summary judgment (ECF No. 155), in which it essentially found:

- The drug test was a search under the Fourth Amendment;

- There was enough support to conduct the search under the reasonable suspicion standard in light of the observations of Plaintiff's drug activity from various sources and the fact that the Commissioner's Procedural Order did not exempt Plaintiff, who was on sick leave, from the reasonable suspicion testing at issue here;

- The drug test itself was performed in a reasonable manner given that (1) there was a compelling government interest in testing employees who would be returning to work and retrieving a firearm; (2) Plaintiff had a lowered expectation of privacy because he was on notice that he may be drug tested per the Commissioner's Procedural Order; and (3) the test was done in the least intrusive manner possible—officers of the same sex were present and more officers were only invited to monitor him once tampering with the sample was suspected; and

- The Collective Knowledge doctrine applied because information was relayed to the Defendants and imputed onto the police department which provided them with the reliable support they needed to test Plaintiff.

(*Id.*)

Plaintiff then filed his motion for reconsideration on December 22, 2023 (ECF Nos. 161-62), with Defendants' opposition following a month later (ECF No. 163).

---

[3] *See generally* Recording of Oral Argument at 11:07- 11:47, *Volpe et. al. v. Ryder et. al.*, No. 19-cv-02236 (JMW) (E.D.N.Y. Sept. 26, 2023) (ECF No. 152) ("Oral Argument").

6

At bottom, Plaintiff argues that the Court was not equipped with the following information in deciding the motion for summary judgment: "how the parties' collective bargaining agreement [from 1995] affected the Police Department's ability to search officers, and the procedure it was required to follow when doing so." (ECF No. 162 at 1.) He believes that not addressing this information is "clear error" which arose because of an "omission and/or obfuscation of critical facts in the parties' previous filings." (*Id.* at 2.) He ultimately states there is an open issue regarding how Defendants infringed on Plaintiff's constitutional rights and those under the CBA because they failed to adhere to the agreed-upon drug testing procedures. (*Id*. at 8-9.)

Defendants aver that Plaintiff cannot overcome the strict reconsideration standard. (ECF No. 163.) Specifically, they contend that the operative Amended Complaint only addressed the Fourth Amendment claim and Plaintiff now wishes to argue a new claim, *i.e.*, a purported violation of the collective bargaining agreement ("CBA"), which was not previously raised by Plaintiff. (*Id.*) They maintain that Plaintiff cannot move to reargue simply because he disagrees with the Court's prior ruling and does not provide a resolution to redress this alleged CBA violation. (*Id.*)

## **LEGAL FRAMEWORK**

A motion for reconsideration may be filed pursuant to Federal Rule of Civil Procedure 59(e) or 60(b). "A motion for reconsideration [under Rule 59(e) or Local Rule 6.3] is appropriate when the moving party can demonstrate that the Court overlooked controlling decisions or factual matters that were put before it on the underlying motion . . . and which, had they been considered, might have reasonably altered the result before the court." *Herschaft v. N.Y.C. Campaign Fin. Bd.*, 139 F. Supp. 2d 282, 283 (E.D.N.Y. 2001) (internal quotation marks and citation omitted). Notably and of particular relevance here, "a party may not advance new

7

facts, issues, or arguments not previously presented to the Court on a motion for reconsideration." *Superior Site Work, Inc. v. NASDI, LLC,* No. 14-cv-01061 (ADS) (SIL), 2017 U.S. Dist. LEXIS 77453, at *4 (E.D.N.Y. May 22, 2017) (internal quotations omitted); *see also Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) (citation omitted) (noting that a motion for reconsideration is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple). Put simply, a reconsideration motion is not appropriate to simply secure a "do-over."

Reconsideration is appropriate if there is an intervening change of controlling law, new evidence comes to light not previously available, or to correct a clear error or prevent manifest injustice. *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 104 (2d Cir. 2013); *T.Z. v. City of New York*, 634 F. Supp. 2d 263, 268 (E.D.N.Y. 2009). Moreover, Rule 60(b) permits relief from an order or judgment for mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, fraud, or in exceptional or extraordinary circumstances. Fed. R. Civ. P. 60(b). The question therefore, is whether any of these grounds have been met.

It is within the sound discretion of the district court to decide whether or not to grant a motion for reconsideration. *See Gupta v. Attorney Gen. of United States*, 52 F. Supp. 3d 677, 679-80 (S.D.N.Y. 2014). Keeping these principles in mind, the Court considers the instant motion.

## **DISCUSSION**

Plaintiff argues that on June 27, 1995, the Nassau County Police Department Police Benevolent Association and Nassau County "engaged in contract negotiations that resulted in a Memorandum of Agreement ("MOA") that was incorporated into the Collective Bargaining

8

Agreement ("CBA")."  (ECF No. 162 at 5.)  Plaintiff states that an Exhibit A which contained relevant language was to be issued as an Order by the Commissioner.  Plaintiff has not submitted Exhibit A to the Court but only states that it is "essentially the same" as the language in the Commissioner's Procedural Order.  (*Id.*)  He claims he has raised this issue before in prior papers.  For instance, the original Complaint stated:

- "The search was beyond of the scope of the Fourth Amendment protections relinquished by virtue of Department policy and the CBA." (ECF No. 1 ¶ 186.);

- Plaintiff's filing a formal complaint after the drug test (*id*. ¶ 176);

- Defendants' alleged disregard for Plaintiff's rights (*id*. ¶¶ 177-78); and

- The PBA's sending letters and filing a grievance on Plaintiff's behalf due to the drug test (*id*. ¶ 177).

The relevant terms of the asserted CBA only state the following:

- "[T]he parties have agreed it would be in accordance with harmonious labor-management relations to enter into an *agreement that permits certain testing of police officers for the illegal use or abuse of drugs*";

- "[T]he parties have further agreed to the *terms and conditions for drug testing procedures for police officers* in the Nassau County Police Department;"

- "The parties have negotiated the terms and conditions of drug testing procedures for police officers of the Nassau County Police Department, *attached hereto as Exhibit A and is incorporated by reference as if fully stated herein*."

- "This agreement will be incorporated into the parties' collective bargaining agreement at the earliest possible date and will immediately be treated for all purposes as if it is part of the parties collective bargaining agreement for all purposes, including but not limited to the applicability of the grievance procedures to resolve any disputes that may arise."

(ECF No. 162-2) (emphasis added).

Further there is a distant reference to the CBA in Plaintiff's attached grievances:  "I have informed you in the past that these two Supervisors [Massaro and Sacks] from MAO have

9

ordered this Officer [Volpe] to remain in his residence *beyond the agreed-upon contractual restrictions*." (ECF No. 162-4 at 2) (emphasis added).

Additionally, in a grievance authored by Losquadro regarding the results of the drug test at issue, he said:

- "I am submitting this grievance at Step 3 pursuant to Section 5.2-4 of the parties' Collective Bargaining Agreement…since this grievance affects more than an individual." (*Id*. at 5.)

- "The Memorandum of Agreement dated June 27, 1995 incorporates the terms and conditions of drug testing into the Collective Bargaining Agreement between the PBA and the County." (*Id*.)

- "Moreover, the Department's Chief Surgeon stated to Police Officer Volpe, in the presence of PBA President McDermott, that they had to test him for "everything, one by one" because Officer Volpe "didn't tell us what you're taking." That statement by the Department, through its Chief Surgeon, specifically violates *Paragraph 1 of the December 31, 2013 MOA, which provides that the "County/NCPD shall make no pre-testing inquiry regarding employee medications (prescribed and over-the-counter)."* Police Officer Volpe, pursuant to his contractual rights, including those contained in the December 31, 2013 MOA, previously did not set forth the medications he takes. The Police Surgeon's statement represents an effort to coerce, intimidate and compel employees who are members of our Association to not adhere to Paragraph 1 of the December 31, 2013 MOA by making clear to them that drug testing procedures with respect to them will be prolonged and overly intrusive due to "not being told" what medication an employee takes. Further, such conduct by the Department, through its Chief Surgeon, clearly constitutes and represents anti-union activity, as it actively seeks to prevent Association Members from asserting and enjoying collectively bargained rights. The actions by the Department throughout the incident described above resulted in violations of the parties' CBA, subsequent interest arbitration awards[4], the December 31, 2013 MOA and other relevant memoranda or agreement, and associated practices." (*Id*. at 5-6) (emphasis added).

---

[4] A prior arbitration award allegedly found that there is no restriction of drinking water to comply with a drug test and Massaro violated these terms by only allowing Plaintiff to drink 20 ounces prior to attempting to provide a sample. (ECF No. 162-4 at 8.) However, in Losquadro's deposition, he stated he was unaware as to whether an excessive amount of water could dilute a urine sample. (ECF No. 162-5 at 66-67.)

10

In yet another grievance letter dated January 25, 2019, Losquadro mentions the following documents:

(1) a letter by Assistant Chief Robert E. Bishop dated December 5, 1996 that "clarified issues relating to the Department's drug test policy" which attached

(2) a one page order labeled 14-96 that "provides guidance regarding drug tests";

(3) a Stipulation of Settlement and Memorandum of Agreement dated December 31, 2013 signed by the Department and PBA.

(ECF No. 162-4 at 7.)  In this grievance letter, Plaintiff states that Defendants failed to adhere to the agreed-upon procedures by failing to inform Plaintiff that he was the subject of an internal investigation.  (ECF No. 162-4 at 7-8.)

Here, Plaintiff has not demonstrated "an intervening change of controlling law, the availability of new evidence not previously available, or the need to correct clear error or prevent manifest injustice."  *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992); *see also* EDNY Local Civil Rule 6.3.  Specifically, Plaintiff does not set forth *any* controlling decisions which counsel believes that the Court has overlooked, thus falling far short of meeting the standard for his reconsideration motion to be granted.  The documents he points to that he claims the Court may have overlooked are documents that prior counsel did not include in opposition for the underlying motion for summary judgment.  Failing to include documents otherwise available on the underlying motion is simply not sufficient to grant reconsideration.  *See Brown v. J.F.H. Mak Trucking*, No. 95-CV-2118 (JS), 1999 U.S. Dist. LEXIS 17831, at *3 (E.D.N.Y. Oct. 5, 1999).

Plaintiff also strives to, but cannot, include language from the complaint (ECF No.1) that was previously dismissed.  (*See* ECF No. 70) adopting report and recommendation recommending dismissal of Plaintiff's other claims); (ECF No. 82) (amended complaint).  For

11

example, as mentioned above, Plaintiff points to statements in the original complaint that refer to violations of the Department's policy and the CBA as well as Plaintiff's and the PBA's filing of complaints and grievances in response to the drug test. (*See* ECF No. 1 ¶¶ 176-177, 186.)

Further, no new evidence has surfaced. Here, Plaintiff attempts to describe documents that are purportedly relevant to overturn the Court's determination on Defendants' motion for summary judgment. However, these documents were well within his possession throughout the proceedings, but were never presented on the *underlying* motion for summary judgment for the Court's consideration. *See United States v. LeSane*, No. 22-CR-110, 2023 WL 315268, at *2 (S.D.N.Y. Jan. 19, 2023) (new arguments cannot be made in a motion for reconsideration unless the arguments could not have been previously made when the motion was originally argued); *Brown*, 1999 U.S. Dist. LEXIS 17831 at *3 (motions to reargue "cannot be used as a vehicle to introduce new evidence that should have been set forth during the pendency of the prior motion or could have been discovered in the exercise of due diligence").

Secondly and relatedly, there are a whole host of documents that Plaintiff mentions, but does not attach, for the Court's consideration on *this* motion.

| Document | Description |
|---|---|
| Exhibit A from the CBA | Terms and Conditions for Drug Testing Procedures for Police Officers of the Nassau County Police Department |
| MOA dated December 31, 2013 – Paragraph 1 | "County/NCPD shall make no pre-testing inquiry regarding employee medications (prescribed and over-the-counter)." |
| Arbitration Awards | Stating that there is no limit on the amount of water an officer can drink to prepare for a drug test |
| A letter by Assistant Chief Robert E. Bishop dated December 5, 1996 | Clarifies issues relating to the Department's drug test policy |
| A one page order labeled 14-96 | Provides guidance regarding drug tests |

Notwithstanding this, it would not be "clear error," as Plaintiff emphasizes, for the Court to exclude consideration of these documents. This is because even if Plaintiff *had* attached the operative documents, it would not alter the Court's prior determination for several reasons. *First,* Plaintiff *himself* says Exhibit A to the CBA and the Commissioner's Procedural Order contain essentially the same language. Indeed, the Court's main focus was on the language in the Commissioner's Procedural Order when it decided the motion for summary judgment. (*See generally* ECF No. 155.)

*Second,* during Losquadro's deposition, he was questioned about the relevance of the CBA:

> Q: "Did that agreement include any resolution of any suspicion that then Officer Volpe might have been abusing illegal narcotics?"
>
> A: "No."
>
> Q: "Did that agreement preclude the department from subjecting then Officer Volpe to a drug test that there were reasonable suspicion that he was under the influence of drugs?"
>
> A: "No."
>
> Q: "So why raise that agreement with Lieutenant Massaro if that agreement didn't preclude the drug test?"

(ECF No. 162-5 at 95.) This dialogue indicates that the CBA would not have prevented Defendants from ordering the drug test and changed any events that occurred.

*Third* and relatedly, Plaintiff appears to take issue with the fact that the officers did not tell him what he was being accused of, which allegedly violates the CBA. (*See* ECF No. 162-5 at 51.) ("[Massaro] said it was for cause. [Losquadro] then proceeded to ask him what the cause was and he refused to tell me why. Again that's a violation of our contract, it's a violation of our drug policy. Every person is entitled to know what they are being accused of so they can

13

properly have representation to meet those charges."); (*see also id.* at 95.) However, he standard to conduct the test was met and the manner in which the test was conducted was reasonable as the Court previously found. (*See* ECF No. 155 at 21.)

In light of (i) the fact that Plaintiff raises statements from an inoperative complaint as support for the instant motion, (ii) the fact that he could have raised these arguments and new documents in his opposition to the motion for summary judgment, and (iii) the futility of such arguments and documents, his motion for reconsideration is denied. *See Ass'n of Holocaust Victims of Restitution of Artwork & Masterpieces v. Bank Aus. Creditanstalt AG,* No. 04-cv-3600 (SWK), 2005 U.S. Dist. LEXIS 28880, at *6 (S.D.N.Y. Nov. 16, 2005) (denying motion for reconsideration where plaintiff failed to present newly discovered evidence and explain why the evidence could not have been found by due diligence, which "warrant[ed] no change from the Court's prior ruling"); *Lima LS PLC v. Nassau Reinsurance Grp. Holdings, L.P.,* 160 F. Supp. 3d 574, 578-79 (S.D.N.Y. 2015) (denying motion for reconsideration where movant failed to identify an intervening change of controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice).[5]

---

[5] Because the Court denies Plaintiff's motion, it need not consider his additional argument as to whether the PBA is a necessary party. (ECF No. 162 at 8-9.)

## **CONCLUSION**

For the reasons stated herein, Plaintiff's Motion for Reconsideration (ECF No. 161) is denied.

Dated: Central Islip, New York
      April 11, 2024

S O   O R D E R E D:

/S/ *James M. Wicks*
    JAMES M. WICKS
United States Magistrate Judge